**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIC OWEN MANN,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN,
*Respondent-Appellee.*

No. 09-99017

D.C. No.
4:03-CV-00213-CKJ

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted En Banc January 11, 2016
Pasadena, California

Filed July 15, 2016

Before: Sidney R. Thomas, Chief Judge, and Susan P.
Graber, M. Margaret McKeown, Kim McLane Wardlaw,
Marsha S. Berzon, Richard R. Clifton, Consuelo M.
Callahan, N. Randy Smith, Morgan Christen, Paul J.
Watford, and John B. Owens, Circuit Judges.

Opinion by Judge Clifton;
Partial Concurrence and Partial Dissent by Chief Judge
Thomas;
Partial Concurrence and Partial Dissent by Judge Christen

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The en banc court affirmed the district court's judgment denying Arizona state prisoner Eric Owen Mann's 28 U.S.C. § 2254 habeas corpus petition challenging his conviction and capital sentence for two counts of first-degree murder.

The en banc court held that Mann is not entitled to relief on his claims of guilt-phase ineffective assistance of counsel.

Regarding his claim of ineffective assistance of counsel at sentencing, Mann argued that the state post-conviction court applied an improper "more-likely-than-not" prejudice standard. The en banc court concluded that the state post-conviction court's invocation of the *Strickland* prejudice standard might have been ambiguous but was not clearly incorrect. As a result, Mann's petition presented this court with the question: When, in the absence of clarity, can this court conclude that a state court has applied the wrong standard to review a *Strickland* claim raised in a petition for post-conviction relief? The en banc court held that it must approach this question with the deference AEDPA requires and grant habeas relief only if no fairminded jurist could conclude that the adjudication was consistent with clearly established Supreme Court precedent. The en banc court held that fairminded jurists could conclude that the state court's review of Mann's claim of ineffective assistance of counsel comported with *Strickland*.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Regarding Mann's argument, in reliance on *Eddings v. Oklahoma*, that the state court improperly excluded mitigating evidence presented during post-conviction proceedings on the ground that Mann had not demonstrated a causal link between the evidence and the crime, the en banc court explained that *Eddings* cannot provide a back door to de novo review where there is no indication that the state post-conviction court excluded evidence that would have led to a reasonable probability of a different sentence in violation of clearly established federal law.

The en banc court held that it was not contrary to, and did not involve an unreasonable application of, federal law for the state court to conclude that Mann failed to show that the mitigating circumstances he presented before the sentencing and post-conviction courts outweighed the aggravating circumstances of his crimes.

Applying AEDPA deference to the state court's conclusion that Mann was not prejudiced by his counsel's alleged failure to present certain mitigation evidence at sentencing, the en banc court could not conclude that it was unreasonable for the state post-conviction court to find that the new evidence as to Mann's capacity for remorse and the effect of a 1985 car accident on Mann's behavior did not undermine confidence in the outcome of sentencing.

Concurring in part and dissenting in part, Chief Judge Thomas agreed with the majority that Mann is not entitled to relief on his guilt-phase claims of ineffective assistance of counsel, and disagreed that he is not entitled to relief on his claim of ineffective assistance of counsel at sentencing.

Concurring in part and dissenting in part, Judge Christen, joined by Judge Berzon, agreed with the majority and the Chief Judge that petitioner did not meet his burden of establishing a meritorious guilt-phase claim, joined the Chief Judge's analysis and conclusion that Mann is entitled to de novo review on his sentencing-phase ineffective assistance of counsel claim, joined the Chief Judge's discussion of *Strickland*'s deficient performance prong, but concluded that Mann is not entitled to relief because she was not persuaded that he met his burden of establishing prejudice.

---

**COUNSEL**

Cary S. Sandman (argued), Federal Public Defender's Office, Tucson, Arizona; Amy Krauss, Law Office of Amy B. Krauss, Tucson, Arizona; for Petitioner-Appellant.

John Pressley Todd (argued), Assistant Attorney General; Kent Cattani, Chief Counsel; Mark Brnovich, Attorney General of Arizona; Capital Litigation Section, Office of the Attorney General, Phoenix, Arizona; for Respondent-Appellee.

---

**OPINION**

CLIFTON, Circuit Judge:

Petitioner Eric Owen Mann lured Richard Alberts and Ramon Bazurto to his house in 1989 with a promise to sell them cocaine for about $20,000. Instead, he took the money and shot both men to death. Mann was eventually arrested and tried in Arizona state court in 1994. A jury found him guilty on two counts of first-degree murder, and the trial judge sentenced him to death, noting his long criminal history and his apparent lack of remorse for the killings. Following the affirmance of his convictions and sentence by the Arizona Supreme Court, Mann filed a petition for post-conviction relief in state court in 2000 asserting, among other claims, that he had received ineffective assistance of counsel at trial and sentencing. That petition was assigned to the same judge who had presided over Mann's trial and imposed the capital sentence upon him a few years before. The judge denied in full Mann's petition for post-conviction relief, and the Arizona Supreme Court thereafter denied Mann's petition for review. Mann then filed a petition for habeas corpus under 28 U.S.C. § 2254 in federal district court. That petition was denied, and Mann appeals.

Of primary importance here is Mann's argument that the state post-conviction court applied the wrong standard to his claim of ineffective assistance of counsel at sentencing, in violation of Supreme Court precedent in *Strickland v. Washington*, 466 U.S. 668 (1984). Because of this error, Mann argues, our review of that claim should not be constrained by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which requires federal courts to defer to state court decisions on the merits of habeas corpus claims

unless they are contrary to clearly established federal law. 28 U.S.C. § 2254(d). After careful review of the underlying state court decision, we conclude that its invocation of the *Strickland* prejudice standard might have been ambiguous but was not clearly incorrect. As a result, Mann's petition presents us with the question: When, in the absence of clarity, can we conclude that a state court has applied the wrong standard to review a *Strickland* claim raised in a petition for post-conviction relief? The answer is that we must approach this question with the deference AEDPA requires and grant habeas relief only if no fairminded jurist could conclude that the adjudication was consistent with clearly established Supreme Court precedent. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Here, fairminded jurists could conclude that the state court's review of Mann's claim of ineffective assistance of counsel comported with *Strickland*. Applying AEDPA deference to Mann's claims, we conclude that the state post-conviction court's denial of post-conviction relief was not contrary to, or an unreasonable application of, federal law. We therefore affirm the district court and deny Mann's petition for habeas relief.

## I. Background

### A. The murders

In the fall of 1989, a few weeks before Thanksgiving, Mann arranged to sell Richard Alberts a kilogram of cocaine in exchange for about $20,000. Mann never intended to provide Alberts with the drugs. Instead, he planned to hand Alberts a shoebox full of newspaper and take his money in

exchange. He knew he would have to kill Alberts after this transaction took place.

On the evening of Thanksgiving Day, Alberts arrived at Mann's house to complete the sale, accompanied by another man, Ramon Bazurto. Mann's girlfriend, Karen Miller, was also at the house to provide Mann with backup. Miller testified that when Mann saw Alberts had brought along someone else, he became upset, but after a brief hesitation decided he would nevertheless go through with his plan to rip Alberts off. The three men and Miller went to Mann's bedroom, where Alberts handed Mann the money and Mann gave Alberts the newspaper-filled shoebox. When Alberts lifted the top of the box, Mann shot him and then Bazurto.

Alberts died almost instantly from a shot through the heart. Bazurto took longer to die. He fell onto his back and lay on the ground, attempting to move his hand towards the pistol he was carrying in his waistband. According to Miller's testimony, Mann stood over Bazurto's prone body and described what was happening as Bazurto lost motor control and died. Miller testified that Bazurto continued to move for three to five minutes after being shot.

Mann then called a friend, Carlos Alejandro, to help him dispose of the two bodies. They dumped the bodies on the side of a gravel road. The next day, Mann and Miller cleaned the apartment and patched the walls where the bullets that had killed Alberts and Bazurto had entered. Mann gave Alberts's car to a friend and disposed of his guns and the recovered bullets. When police later questioned Mann as to the whereabouts of Alberts and Bazurto, Mann responded that the two men had come to his house on the evening of the murders

to conduct a drug deal, but had left after Mann and Alberts failed to agree on a price for the drugs.

The case remained unsolved for four years. Then, in late 1993, Miller ended her relationship with Mann because of increasing domestic violence. She told the police about the murders in January of 1994. Mann was arrested after the police corroborated Miller's story with Alejandro and the man to whom Mann had sold Alberts's car.

*B. Trial*

Mann's jury trial took place over five days in the Superior Court of Pima County, Arizona. Judge John F. Kelly presided. David Sherman, a criminal defense attorney in private practice, was appointed as Mann's counsel. Sherman pursued the theory that Mann had acted in self-defense.

The day before trial commenced, Sherman told the judge that he would not be calling any witnesses "except for Mr. Mann." Sherman successfully persuaded the trial court that, should Mann testify, his previous conviction for burglary would be excluded from evidence and any mention of his previous conviction for felony possession of a firearm would be limited to the fact that he had been convicted of a felony.

At trial, the state presented testimony from six witnesses, including Miller and Alejandro, both of whom had been granted immunity from prosecution for their roles in the crime. Miller and Alejandro testified that the murders had been premeditated. Mann ultimately did not testify, and Sherman did not call any witnesses of his own, instead attempting to discredit the state's witnesses through cross-

examination. The jury found Mann guilty of two counts of first-degree murder on November 1, 1994.

Two weeks later, the court granted Sherman's request that Mann undergo psychological evaluation prior to sentencing. Sherman recommended that the court appoint Dr. Todd Flynn, a psychologist with the court psychological clinic. With the consent of the attorney for the state, the judge agreed to appoint Dr. Flynn to perform an evaluation.

Dr. Flynn diagnosed Mann with alcohol abuse or dependence, polysubstance abuse or dependence, and antisocial personality disorder. He also noted that Mann had scored highly for "acting out" on the Minnesota Multiphasic Personality Inventory-2 scale, and made the following observation:

> As a group, people with acting out as a primary psychological defense tend to be emotionally shallow, deficient in their capacity for empathy, poor at frustration tolerance, unwilling or unable to delay gratification, and poor at anticipating the consequences of future actions. When combined with a history of victimization of others, this group becomes the worst of offenders because there is little sense of conscience or inhibition to stop the criminal lifestyle. Those who act out intensively and in a criminal manner may also qualify for the designation of Psychopath . . . .

The report concluded, "It is more probable than not that Mr. Mann fits this designation."

The state's presentence report concluded that three aggravating factors were present in the crime: it was committed for pecuniary gain, there were two victims, and Bazurto's murder was committed "in an especially heinous, cruel or depraved manner." Sherman argued for ten mitigating factors: Mann's positive relationship with his daughters, his positive influence on his mother, his unstable and abusive family background, his poor educational experience, his history of substance abuse, his remorse, his cooperation with authorities, his non-violent history, his good behavior while incarcerated, and the disparity between his sentence and Miller and Alejandro's sentences.

At the sentencing hearing, which took place on January 31, 1995, four witnesses testified in support of Mann: a former boss, a former co-worker, his older daughter, and his mother. Mann also submitted a handwritten autobiography.

Judge Kelly found that the state had demonstrated all three of the aggravating circumstances they had identified: (1) the crime was committed for pecuniary gain, (2) there were two victims, and (3) Bazurto's murder was committed "in an especially heinous, cruel or depraved manner."

As for mitigating factors, he found that Mann had a positive relationship with his daughters and his mother, an abusive and unstable family background, a poor educational experience, a history of substance abuse, good conduct while incarcerated, and recent stable employment. The judge declined to find that Mann had cooperated with the authorities, that he had a non-violent history, or that a capital sentence would be disproportionate to sentences imposed on Miller and Alejandro.

The judge concluded that Mann, "by his actions for a period of four years . . . showed no indication of any remorse, particularly his actions as introduced at trial after the murders." The court noted that in his autobiography Mann described getting into a car accident in which two people died, but observed that "he indicates no remorse in that situation." Ultimately, the judge concluded: "[T]he defendant is not capable of remorse. The psychological evaluation is that he has an anti-social personality disorder and that he is a psychopath. Basically, that he has no conscience. The Court believes that his expression[s] of remorse are not genuine." The judge sentenced Mann to death on both counts of murder.[1]

Mann appealed to the Arizona Supreme Court, which affirmed. *State v. Mann*, 934 P.2d 784 (Ariz. 1997) (en banc). The United States Supreme Court denied Mann's petition for a writ of certiorari. *Mann v. Arizona*, 522 U.S. 895 (1997) (mem.).

### C. Post-conviction relief proceedings

Mann filed for post-conviction relief under Rule 32 of the Arizona Code of Criminal Procedure. He alleged, among other claims, that he had been denied effective representation of counsel at trial and sentencing and that newly discovered

---

[1] Until 2002, Arizona's sentencing scheme in capital prosecutions allowed the trial judge to determine "the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." *Ring v. Arizona*, 536 U.S. 584, 588 (2002). In that year, the Supreme Court held that this system violated the Sixth Amendment right to a jury trial. *Id.* at 609. Two years later, in *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), the Court clarified that the new rule set forth in *Ring* did not apply retroactively to cases already final on direct review.

evidence probably would have changed the verdict at the trial or sentencing. Among the arguments in his post-conviction brief, Mann claimed that Sherman "did little mitigation investigation or preparation for the mitigation hearing." The brief described Mann's 1985 automobile accident in great detail, including his remorse at the deaths of his two passengers, the injuries to his leg and head, and the changes in his personality and circumstances that resulted.

Mann also filed two additional expert reports: one from Dr. Richard Hinton, a clinical psychologist, and one from Dr. James Comer, a clinical neuropsychologist. Dr. Hinton's report concluded:

> Despite Mr. Mann's extremely difficult childhood and his relatively long pedigree as a violator of the law, it does appear that his functioning changed dramatically following the automobile accident. At that time he experienced a severe injury to his leg which caused him to be unable to work and which resulted in mounting debt. It also appears likely that he was tormented by a sense of guilt that he was somewhat responsible for the death of the two passengers in his car. From that time forward he began to behave much more aggressively and to use cocaine much more regularly.

Dr. Comer's report concluded that "Mann appears to have experienced a T[ramuatic ]B[rain ]I[njury] leading to subtle though lasting cognitive deficits and other symptoms of post-concussional syndrome."

The post-conviction proceedings were assigned to Judge Kelly, the same judge who had presided over Mann's trial and sentencing. Judge Kelly held several evidentiary hearings, in which he heard testimony from Miller,[2] Mann, Sherman, and Dr. Comer. The bulk of the post-conviction factfinding concerned the 1985 car crash. Miller testified that "[t]hings took a drastic turn" after the accident, that the doctors who examined Mann after the accident were "very concerned that he had had some head injuries," and that he became "very depressed." In particular, she said, the information that Mann's 14-year-old passenger had been decapitated in the accident "really tore him up" and "many times he said he wished he had died in the accident too." Mann testified that he had "suffered some type of concussion" as a result of the accident and that the accident "was a huge burden emotionally, physically, the way it affected friends, family." Sherman testified that he had not learned of the severity of the accident until after Mann's conviction and that he was "not focused on mitigation" during his representation.

Dr. Comer testified that some of Mann's test results suggested "that he may have experienced a head injury, from which he recovered rather well in most respects, but which had left [him] with some residual, subtle cognitive deficits." Dr. Comer noted that it was the "typical course of events" for the effects of a brain injury to be more severe closer in time to the accident, and that behavioral changes stemming from a brain injury generally "take the form of increased

---

[2] By the time of the post-conviction proceedings, Karen Miller had married and changed her name. For purposes of clarity and consistency, this opinion will continue to refer to her by her name at the time of Mann's trial.

aggression, sexual indiscretions, poor ability to monitor one's behavior, difficulty in appreciating the effect of one's behavior on other individuals, increased irritability, agitation at times, [and increased] egocentricity." He also noted that the records that he reviewed "certainly indicated that there was a significant behavioral and emotional change, perhaps some change in personality as well" that occurred after the 1985 accident. He clarified that any one of the test results "could easily have been produced by other factors as well," but that the significant majority of the test results "fell into that cluster of tests that are known to be sensitive to subtle, longlasting effects" from brain damage.

Judge Kelly responded to Dr. Comer's testimony by commenting that it was "not clear how such a brain injury could have a role" in Mann's crimes, as they had been planned out in advance without "any indication . . . that the murders were committed out of anger or irritability." Dr. Comer replied that he was not stating a finding that Mann's head injury caused him to commit the crimes but rather that "some of the behavior we see postconcussion could produce the disinhibitory aggression" that followed Mann's accident.

Judge Kelly denied Mann's Rule 32 petition in full in an order that will be discussed in more detail below. Subsequently, the Arizona Supreme Court summarily denied Mann's petition for review on all issues except for the jury determination of aggravating factors, which is not at issue in this appeal. Mann then filed a federal habeas petition in the District of Arizona. The district court denied the petition but issued a Certificate of Appealability for three claims: that the Arizona Supreme Court violated Mann's Eighth Amendment rights in reviewing his death sentence, that he received ineffective assistance of counsel at trial, and that he received

ineffective assistance of counsel at sentencing. Mann has limited his appeal to the two claims of ineffective assistance of counsel.

A three-judge panel of this court unanimously affirmed the denial of habeas relief for ineffective assistance of counsel at trial, but, over a dissent, reversed the denial of habeas relief for ineffective assistance of counsel at sentencing. *Mann v. Ryan*, 774 F.3d 1203 (9th Cir. 2014). A majority of the nonrecused active judges on our court subsequently voted to rehear the case en banc. *Mann v. Ryan*, 797 F.3d 654 (9th Cir. 2015) (mem.). We affirm the district court's denial of habeas relief on the ineffective assistance of counsel claims at both trial and sentencing.

## II. Legal Standards

### A. Antiterrorism and Effective Death Penalty Act

Because Mann filed this petition for habeas corpus after April 24, 1996, AEDPA applies to his claims. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under that statute we may not grant an application for habeas corpus for any claim adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in

> light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d). We review the last reasoned state court decision according to this deferential standard. *Towery v. Ryan*, 673 F.3d 933, 944 (9th Cir. 2012) (per curiam). The district court's application of AEDPA to the last reasoned state court decision is a mixed question of law and fact which we review de novo. *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

An adjudication is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). It is an "unreasonable application" of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. The federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

A state court's adjudication is unreasonable only if the federal habeas court concludes that no fairminded jurist could conclude that the adjudication was consistent with established Supreme Court precedent. *See Richter*, 562 U.S. at 102. In that event, AEDPA does not require deference to the state

court's decision, and the petitioner's claims are reviewed de novo.  *See Williams*, 529 U.S. at 406.

### B.  Ineffective assistance of counsel

Mann's claims are based on the alleged violation of his Sixth and Fourteenth Amendment rights to effective assistance of counsel during both the trial and penalty phases of his state court proceedings.  Ineffective assistance of counsel claims are evaluated according to the familiar standard set forth in *Strickland*.  To receive relief under this standard, "[f]irst, the defendant must show that counsel's performance was deficient."  466 U.S. at 687.  "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  *Id.*

The proper standard for attorney performance under the first prong of the *Strickland* test is "that of reasonably effective assistance."  *Id.*  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 687–88. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.

The second prong of the *Strickland* test requires that the defendant show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

## III.    Ineffective Assistance of Counsel at Trial

Mann first argues that he received ineffective assistance of counsel during the trial phase of his proceedings. This argument is based on the alleged negligence of Mann's counsel, Sherman, in (1) failing to recommend that Mann testify at trial, and (2) breaking an "implicit" promise to the jury that Mann would testify in his own defense. Because the Arizona Supreme Court summarily denied the petition for review of this claim, we look through that decision to the decision of the state post-conviction court. *See Towery*, 673 F.3d at 944.

### A.   Sherman's recommendation that Mann not testify at trial

Mann and Sherman presented conflicting accounts of their relationship to the state post-conviction court. Sherman testified that Mann told him "early on in th[e] case" that the murders had been premeditated. Despite this knowledge, Sherman advised Mann that a self-defense theory "would be the best way to go." Sherman said he gave Mann the option to testify at trial that he had acted in self-defense, but told Mann he "would have to withdraw as his attorney" if Mann did so because Sherman knew this testimony would be false. In a letter to Mann approximately one month before trial, Sherman laid out conflicting considerations for Mann to weigh. On the one hand, Mann was the only witness who would be able to testify to his story, which was that Bazurto

had reached for his gun and Mann reacted without thinking. On the other hand, Mann could be cross-examined about his previous criminal activity, as well as allegations of abuse from his former girlfriends. The letter concluded: "I'd hate to have you on death row in Florence having a big regret because you did not testify. When the stakes are this high, I have to leave the final decision up to you."

Mann, in contrast, testified that he told Sherman from the beginning that he had killed Alberts and Bazurto in self-defense. Mann said that he and Sherman "briefly" discussed the possibility that Mann would testify at trial, but that Sherman told Mann that "it would be bad" for him to testify because it would open the door to questions about his prior conviction for felony possession of a weapon. Mann said that he took his attorney's advice and did not testify.

The state post-conviction court concluded that Sherman was more credible than Mann and accepted Sherman's version of the facts as the truth.

Our review of the state habeas court's credibility determinations is highly deferential. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court. . . .").

Mann points to some possible inconsistencies in Sherman's story: Sherman did not mention in his letter that he would withdraw from representation if Mann testified, and he continued to prepare for the possibility that Mann might testify up until the day before trial. Sherman had plausible explanations, however. Sherman said he never told Mann he

couldn't testify, but rather that "if he cho[s]e to do it against my recommendation, I would have to withdraw as his attorney and he could get another attorney to do that, but I wasn't going to put him on the stand."  As for the letter, Sherman testified that he was "finessing the situation" and did not want to put the potential perjury in writing.  Given these considerations, and Mann's obvious motivation to lie, it is impossible to conclude that the state court's findings as to Mann and Sherman's relative credibility "lacked even 'fair[ ] support' in the record."  *Id.* at 432.

Once the state court had found that Sherman was a more credible witness than Mann, it was effectively bound by Supreme Court precedent to conclude that Sherman's decision to discourage Mann from testifying did not constitute ineffective assistance of counsel.  Counsel's duty to advocate for his client is "[p]lainly . . . limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth."  *Nix v. Whiteside*, 475 U.S. 157, 166 (1986).  "Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Id.*  Sherman would have been suborning perjury if, knowing that the murders had been premeditated, he had allowed Mann to testify in support of the theory of self-defense. Under such circumstances, there can be "no failure to adhere to reasonable professional standards that would in any sense make out a deprivation of the Sixth Amendment right to counsel."  *Id.* at 171.

*B. Testimony promised in opening statement*

Mann's claim that Sherman broke an implicit promise to the jury that Mann would testify in his own defense is similarly unavailing. Had Sherman made such a promise, and then broken it, Mann's claim might have merit. Several circuits have held that it may violate *Strickland* for counsel to promise evidence in an opening statement and then fail to present that evidence at trial. *See, e.g.*, *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 258 (7th Cir. 2003) (finding that it was "objectively unreasonable" for counsel to promise the defendant's testimony and then break that promise); *Ouber v. Guarino*, 293 F.3d 19, 27 (1st Cir. 2002) (describing counsel's decision to discourage the defendant from taking the stand as "indefensible" when he had already represented to the jury that the defendant's testimony would be the centerpiece of her defense); *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993) (noting generally that an attorney's failure to produce evidence promised during an opening statement is "sufficient of itself to support a claim of ineffectiveness of counsel").

But Sherman did not promise the jury that Mann would testify. His opening statement detailed the alternative version of events that formed the basis for his defense strategy: he told the jury that Mann had cocaine he intended to sell to Alberts, and that as Mann was handing over the drugs to Alberts, Bazurto "did something that made [Mann] think he was about to be the victim of a drug rip-off." In reaction, Mann "fired at both people and killed them both because he felt like he was forced to do so." Sherman then said, "Now, look at what the facts are. After that we'll see [Mann] didn't plan this." He told the jury to anticipate the testimony of Miller and Alejandro, which he described as "the only

evidence that the[ state will] have of premeditation," and argued that "[w]hen you compare that to the whole story, it doesn't make any sense that if it was planned it would be done this way."

At trial, Sherman successfully elicited testimony from Miller and Alejandro that was inconsistent with the prosecution's theory that the murders were premeditated. For instance, he noted that Miller had testified to standing directly behind Bazurto when he was killed, which she admitted was "awfully close to what the line of fire was going to be" for someone who allegedly knew Bazurto was about to be shot. Miller also testified that there had been no plan to dispose of the bodies. Alejandro testified that the first time he heard anything about Mann's plan was when Mann showed up at his house the night of the crime asking for help. He described Mann as having been "[i]n desperate need," and said that the first thing Mann said to him that night was, "I did it. I had no choice. I had to do it." In other words, Sherman's opening argument "merely summarized evidence that was later produced from which a jury could be left with a reasonable doubt" about whether the crimes were premeditated. *McAleese*, 1 F.3d at 167. This may not have been a successful trial strategy, but it was not improper.

## IV.    Ineffective Assistance of Counsel at Sentencing

Mann also argues that the state court erred in declining to grant habeas relief based on his claim that he had received ineffective assistance of counsel at the sentencing stage of his proceedings. His argument before the state post-conviction court focused on two alleged failings: (1) failure to present reasonably available mitigation evidence at sentencing, and (2) failure to seek adequate assistance in evaluating Mann's

mental health. The last reasoned state court decision on this issue came from the post-conviction court, so that is the decision we review. *See Towery*, 673 F.3d at 944.

Under *Strickland*, Mann is eligible for post-conviction relief if he can show both (1) deficient performance, and (2) prejudice stemming from the deficient performance. 466 U.S. at 687. When addressing Sherman's alleged failure to present reasonably available mitigation evidence at sentencing, the post-conviction court did not consider whether Sherman's performance was deficient. Rather, it elected to move directly to the second prong, as it was entitled to do, and found only that there had been no prejudice. Because the prejudice issue has been "adjudicated on the merits," AEDPA requires us to allow the state court's determination to stand unless it is contrary to or an unreasonable application of federal law or is based on an unreasonable determination of the facts. *Richter*, 562 U.S. at 98.

On appeal, Mann argues that the state post-conviction court's analysis of prejudice was contrary to clearly established federal law. He also argues that, on the merits, Sherman's performance caused Mann prejudice. We address these arguments in order because our evaluation of the first determines the standard of review to be applied to the second. First, we assess whether the state court's decision was contrary to clearly established federal law as determined by the Supreme Court. Second, we assess whether Sherman's performance caused Mann prejudice. If we conclude at the first step that the state court misapplied clearly established federal law, then our review at the second step is de novo. *See Williams*, 529 U.S. at 406. If, however, the court's interpretation of the law was permissible, then AEDPA

governs our review at the second step as well, and we are required to defer to the state court's conclusion that Mann suffered no prejudice from his counsel's alleged failings unless that finding was unreasonable.

### A.  Applicability of AEDPA

Mann argues that we should review his *Strickland* claim de novo because the state post-conviction court made three different legal decisions that were contrary to or an unreasonable application of clearly established federal law. One, he argues that the state post-conviction court applied the wrong standard in assessing prejudice under *Strickland*. Two, he argues that the state court improperly excluded the mitigating evidence presented during post-conviction proceedings because Mann had not demonstrated a causal link between the evidence and the crime.  Three, he argues that the court failed to re-weigh the evidence in aggravation against the totality of the mitigation evidence, including evidence introduced during the sentencing and during post-conviction proceedings.  None of these three allegations gives us a basis to conclude that AEDPA does not apply to Mann's claims.

### i.  *Strickland*'s prejudice standard

The common standard for a motion for a new trial based on newly discovered evidence requires a defendant to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693–94. The Supreme Court considered adopting this standard for the *Strickland* prejudice inquiry but determined that it was "not quite appropriate." *Id.* at 694.  Instead, the Court held that a defendant alleging ineffective assistance of counsel "must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* This sets the bar a bit lower but not a lot lower. "[T]he difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Richter*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 697).

The claims presented by Mann in the state post-conviction proceedings at issue here included an argument that new mitigation evidence related to the 1985 accident merited a new sentencing. Those claims were identified as "Issues Three and Four."**[3]** Mann's claim that Sherman's failure to raise the evidence at the original sentencing constituted ineffective assistance of counsel was described as "Issue Seven." Judge Kelly denied relief on both claims.

As to Issues Three and Four, he found:

> The record shows that Defendant provided this Court with evidence of the accident and its effects in the form of an autobiography he presented to show mitigation. Nonetheless, additional evidence, particularly that set forth in psychological reports, was submitted as part of this Petition. *The Court finds, however, that nothing presented would have changed the verdict or the sentence imposed.* The Court finds that Defendant has not proven

---

**[3]** Mann did not receive a Certificate of Appealability as to these claims and does not raise them on appeal. We discuss them here only because they are relevant to determining the standard that the state post-conviction relief court applied to the ineffective assistance of counsel claim.

the existence of a causal connection between
the accident and its effects and the murders.
The record shows, for example, that
Defendant dealt drugs and used guns against
others before and after the accident; that he
did not misperceive a threat and overreact,
but, rather, carefully planned to kill Alberts,
then "made a choice, after a period of thought
and said, 'Well, I've got to do it,' apparently
meaning that to go through with the plan he
would also have to murder Bazurto."
Defendant committed these murders for
pecuniary gain, not for reasons traceable to his
1985 accident. Accordingly, the claims are
denied.

(emphasis added) (citation omitted).

Meanwhile, as to Issue Seven, Judge Kelly found:

To succeed on this claim and on the others
that follow below, Defendant must show that:
(1) counsel's performance was deficient, as
defined by prevailing professional norms; and
(2) the deficient performance resulted in
prejudice to the defense. *State v. Nash*, 143
Ariz. 392, 694 P.2d 222 (1985). Here,
Defendant has failed to show prejudice. Some
of the evidence he accuses Sherman of not
presenting, e.g., testimony from family
members, was in fact presented to this Court
at sentencing. Additional evidence that
pertains to the 1985 accident and its effects is
discussed under "Issues Three and Four"

above, where this Court found that it would
not have changed the sentence imposed.  For
that reason, Defendant was not prejudiced by
counsel's performance and the claim is
denied.

Mann argues that the state post-conviction court's
conclusion that the new evidence "would not have changed
the sentence imposed," combined with the court's reference
to the analysis for "Issues Three and Four," suggests that it
applied the wrong standard in analyzing Mann's ineffective
assistance of counsel claim.  Rather than finding that there
was no reasonable probability that the new evidence would
have changed the sentence imposed, Mann argues, the post-
conviction court imported the standard from its analysis of
the motion for a new trial into its analysis of the ineffective
assistance of counsel claim and concluded only that the new
evidence more likely than not would not have changed the
sentence imposed.

Had the state post-conviction court applied the more-
likely-than-not standard to analyze Mann's ineffective
assistance of counsel claims, its opinion would have been
contrary to clearly established federal law under AEDPA.
The Supreme Court considered and explicitly rejected the
more-likely-than-not standard in *Strickland*.  466 U.S. at
693–94.  But the standard the court applied is not clear on the
surface of its decision.  Judge Kelly simply said that the
additional information about Mann's accident "would not
have changed the sentence imposed."  This leaves us to draw
inferences as to the precise standard the court used in
reaching the decision to deny each of Mann's claims.

Reading the opinion as a whole, the more logical inference here is that the standard used by the state post-conviction court was the correct reasonable probability standard. While the court did not clearly state the standard it applied, either for the newly discovered evidence claim or for the ineffective assistance of counsel claim, it indicated that the ineffective assistance of counsel claim was controlled by *State v. Nash*, 694 P.2d 222 (Ariz. 1985), in which the Arizona Supreme Court adopted the reasonable probability standard.

Judge Kelly also made various factual findings that suggested he was deeply skeptical that evidence about the accident had any significant impact on Mann's mitigation profile. Most importantly, he noted that Mann dealt drugs and used guns prior to the accident, premeditated both murders, and committed them for pecuniary gain. Taken in context, the judge's discussion of Issues Three, Four, and Seven suggests that he knew the proper standard for both the new evidence claim and the ineffective assistance of counsel claim, but concluded that the new evidence made at most a minimal difference, such that the standard applied would have no effect on the outcome of either claim. This inference is particularly strong because Judge Kelly was the same judge who had handed down Mann's initial sentence, giving him particular insight into how the additional evidence would, or would not, have changed Mann's mitigation profile. *See Schriro v. Landrigan*, 550 U.S. 465, 476 (2007) (noting that the judge presiding over the post-conviction review was "ideally situated" to interpret an interaction that had taken place in the trial court because she had also presided over the trial). Because of that fact, it is not surprising that Judge Kelly would have spoken in direct terms—"nothing presented would have changed the verdict or the sentence imposed"—

rather than in words designed to express degrees of probability.

At worst, the state court opinion is ambiguous. But, as we have noted in the past, "[u]nder AEDPA, we must do more than find the statement ambiguous." *Lopez v. Schriro*, 491 F.3d 1029, 1037–38 (9th Cir. 2007). Our analysis starts with a "presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Next, we "determine what arguments or theories supported or . . . could have supported[] the state court's decision." *Richter*, 562 U.S. at 102. Finally, we ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id.* Here, it is possible to read the state court's decision in a way that comports with clearly established federal law. The judge, who had imposed the sentence originally and who was already familiar with Mann's mitigation profile, concluded that the additional information provided at the post-conviction hearing would have made little difference. Accordingly, he denied Mann's petition for post-conviction relief. Under AEDPA, because we can read the decision to comport with clearly established federal law, we must do so. We cannot conclude that the state post-conviction court's application of *Strickland* misunderstood or misapplied clearly established federal law.

ii. Causal nexus

Mann also argues that the state post-conviction court violated clearly established federal law when it improperly refused to consider evidence about Mann's car accident because he had "not proven the existence of a causal connection between the [1985 car] accident and its effects

and the murders." This argument relies on *Eddings v. Oklahoma*, in which the Supreme Court held that the "Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). "The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114–15.

Our court has concluded that the law in Arizona at the time of Mann's post-conviction proceedings, in spite of this clear command, required that defendants demonstrate "actual causation" linking their alleged mitigating circumstances with the crime for which they were being sentenced. *McKinney v. Ryan*, 813 F.3d 798, 815 (9th Cir. 2015) (en banc). The causal nexus test provided that, "[i]f the defendant fails to prove causation, the circumstance will not be considered mitigating. However, if the defendant proves the causal link, the court then will determine what, if any, weight to accord the circumstance in mitigation." *State v. Hoskins*, 14 P.3d 997, 1022 (Ariz. 2000) (en banc). In *Tennard v. Dretke*, the Supreme Court held that a comparable causal nexus test violated defendants' Eighth Amendment right requiring the finder of fact to "'be able to consider and give effect to' a capital defendant's mitigating evidence." 542 U.S. 274, 285 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)).

Mann does not and cannot argue here that the state post-conviction court violated clearly established federal law by

applying Arizona's unconstitutional causal nexus test. Mann did not present a post-conviction *Eddings* claim before the Arizona Supreme Court, so we have no jurisdiction to grant relief on that issue. *See Rose v. Lundy*, 455 U.S. 509, 515 (1982). Mann contends that what effectively amounts to an *Eddings* claim nevertheless comes in on the back of his *Strickland* claim, since Judge Kelly applied the causal nexus test to bar evidence about the effects of the accident and therefore did not properly consider whether Sherman's failure to present that evidence at sentencing led to a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

This argument fails to acknowledge that Judge Kelly's comment about the lack of a causal connection between the accident and the murders was directly responsive to the evidence Mann presented before the state post-conviction court. Dr. Hinton's neuropsychological report concluded that "it does appear that [Mann's] functioning changed dramatically following the automobile accident," noting that "[f]rom that time forward he began to behave much more aggressively and to use cocaine much more regularly." Dr. Comer's evaluation concluded that "Mann's functioning had changed dramatically after the [accident], as exemplified by increased aggression." Meanwhile, Miller testified that, after the accident, Mann "began to intimidate people," "liked to use power to scare people," and "was 'pointing guns to people's heads and telling them . . . don't fuck with me [or] I'll blow your head off." Miller stated that she believed that "the change in [Mann] was a result of the accident, the trauma, and the cocaine use." In his petition for post-conviction relief, Mann argued:

> There is no question that this evidence, if
> presented to the Court in mitigation, could
> have resulted in a sentence other than death.
> As described by Karen Miller, the killing of
> Bazurto and Alberts was of a piece with the
> change that occurred in Petitioner as a result
> of the accident.  It was a crime of power and
> money, and the clear result of the fundamental
> personality and character changes that
> occurred in Eric Mann as a result of the
> accident.

The dissent notes, at 44, that Mann argued at the post-conviction hearing that the new evidence as to the effects of the accident would have suggested a mitigating reason for some of his behavior and "would have provided some free-standing mitigation of itself."  As we have noted in the past, however, courts generally find explanatory mitigation evidence more convincing than humanizing mitigation evidence. *See Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005).  Perhaps recognizing this, Mann focused his attention on arguing that the circumstances and the neuropsychological effects of the accident explained his decision to commit murder.  Thus, while the dissent may be correct that the post-conviction court did not discuss how Mann's brain damage could have reduced his moral culpability or altered his sentencing profile apart from having contributed to the crime, that was not the core of the argument to which the post-conviction court responded. Mann's substantive arguments at the post-conviction hearing were focused on the link between the accident and the murders.  He argued that after the accident, "the nature of his problems and degree of his problems and degree of his behavior changed radically," that Dr. Comer "concluded

either because of the accident or the aftermath of the accident or his heavy drug use, it's not unreasonable to conclude that Mr. Mann might have perceived a threat and that he overreacted," and that Dr. Comer had "ma[d]e a connection" between the murders and "what people with the kind of injury . . . Mann was determined to have . . . ordinarily do." The court could not have properly addressed these arguments without considering the causal relationship between the new evidence and the crimes.

In addition, it is clear elsewhere in the record that Judge Kelly did not exclude evidence from his mitigation assessment based solely on the lack of a causal nexus with the crime when that evidence was not presented as causal. For instance, he found during sentencing that Mann had demonstrated several mitigating factors unrelated to the murders, including that Mann had an "unstable and abusive family background," a poor educational background, and a history of substance abuse.

As *Eddings* itself makes clear, it is well within the sentencer's power to "determine the weight to be given relevant mitigating evidence." 455 U.S. at 114–15. Here, Judge Kelly considered Mann's argument that the accident led to a fundamental change in his personality that set him on a path towards murder and found it unconvincing. This conclusion was entirely within the court's power. As such, there is no indication that Judge Kelly excluded evidence that would have led to a reasonable probability of a different sentence in violation of clearly established federal law, and *Eddings* cannot provide a back door to de novo review.

iii.  Re-weighing old and new evidence

Finally, Mann argues that the state court erred in failing
to reweigh the old and new mitigation evidence against the
existing aggravation evidence during post-conviction
proceedings.  Courts considering additional evidence in post-
conviction proceedings must "evaluate the totality of the
available mitigation evidence—both that adduced at trial, and
the evidence adduced in the habeas proceeding in reweighing
it against the evidence in aggravation." *Williams*, 529 U.S. at
397–98.

There is no indication that the state court did not fulfill
this duty here.  The court did not explicitly state that it had
reweighed the evidence, but that is not the standard.  Instead,
"[i]t is sufficient that a sentencing court state that it found no
mitigating circumstances that outweigh the aggravating
circumstances." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir.
1998) (quoting *Poland v. Stewart*, 117 F.3d 1094, 1101 (9th
Cir. 1997)).  In this case, it was enough that the court found
that the additional mitigation evidence Mann provided at the
post-conviction proceedings was cumulative, not credible, or
would otherwise have had no effect on the sentencing
decision.

The dissent's attempt to fold Mann's claim of *Eddings*
error into his claim that the state post-conviction court failed
to properly re-weigh the evidence does not change this
conclusion.  As discussed above, the state court reasonably
concluded that the additional evidence about Mann's 1985 car
accident did not cause a fundamental change in his
personality or set him on the path that led to Alberts' and
Bazurto's murders, and therefore gave the new evidence little
to no weight in mitigation.  Therefore, it was not contrary to,

and did not involve an unreasonable application of, federal law for the court to conclude that Mann had failed to show that the mitigating circumstances he had presented before the sentencing and post-conviction courts outweighed the aggravating circumstances of his crimes.

## B. *Reasonableness of state court's prejudice finding*

Even though Mann has not demonstrated that the state post-conviction court's opinion should be subject to de novo review, he could still secure habeas relief under AEDPA if he could demonstrate that it was "unreasonable" for the state court to conclude that Mann was not prejudiced by his counsel's alleged failings. *See Richter*, 562 U.S. at 101. A court ruling is unreasonable if it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Under *Strickland*'s prejudice prong, the petitioner seeking habeas relief must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is conceivable that the evidence that emerged in the state post-conviction proceedings might have changed Mann's profile somewhat had Mann's attorney presented it at sentencing. For example, Mann notes that while the state sentencing court concluded that he was "incapable of remorse," evidence was presented to the state post-conviction court that supported the contention that he had in fact been deeply affected by the 1985 car accident in which two people died. Mann also notes that Dr. Flynn's damning suggestion that he might be a

psychopath failed to account for the possibility of a traumatic brain injury, and that further testing would have revealed that the injury significantly changed his personality, effectively turning a significant aggravating factor into a significant mitigating factor.

But, as noted above, even if the accident had an effect on Mann's personality, it hardly changed an altar boy into a callous criminal. The presentence report submitted by the probation department attached a long criminal history record that included 14 offenses predating Mann's 1985 car accident. While Mann's earliest crimes were minor, they escalated over time. In 1980, Mann was sentenced to probation for third-degree burglary. In 1982, he was arrested after pointing a gun at the victim of an attempted car theft, at which point his probation for the burglary offense was revoked and he was sentenced to two years in prison. The presentence report also noted that Mann stole to support his family starting around age 15. Mann himself acknowledges that his pre-accident record was "troubling" and that the sentencing court had already been presented with "credible and potent mitigation" that it found outweighed by the heinous nature of Mann's crime.

Given this history, it was not unreasonable for the state post-conviction court to conclude that the accident had no significant effect on Mann's behavior. He had set on a path of violent crime long before the accident occurred. Nor was it unreasonable for the court to conclude that additional evidence of Mann's good character was not enough to outweigh the various aggravating factors that the sentencing court had found: (1) the crime was committed for pecuniary gain, (2) there were two victims, and (3) Bazurto's murder was committed "in an especially heinous, cruel or depraved

manner."    Indeed, the aggravating factors remained unaffected by the new mitigating evidence.[4]  And, while the new evidence did suggest that Mann had been remorseful about the car accident, it did not undermine the sentencing court's conclusion that Mann had shown no remorse for the cold-blooded murders of which he had been convicted.  We cannot conclude that it was unreasonable for the state post-conviction court to find that the new evidence as to Mann's capacity for remorse and the 1985 car accident did not "undermine confidence in the outcome" of the sentencing.  *See Strickland*, 466 U.S. at 694.

## V.  Conclusion

The judgment of the district court denying habeas relief as to both Mann's convictions and his sentence is affirmed.

**AFFIRMED.**

---

[4] Mann argues that Miller "admitted during the PCR proceedings[] that neither victim suffered and that they died or became unconscious almost simultaneous with the shootings."  Had she said this, it could have undermined the sentencing court's conclusion that Bazurto's murder was especially cruel, heinous, or depraved.  However, Miller actually said at the post-conviction hearing that she didn't know whether Bazurto's movements after he was shot were voluntary or involuntary, that it was "possible" that Mann had not accurately described the last moments of Bazurto's life to her, and that it was "possible" that he had been unconscious even though she believed him to have been awake and struggling.  To the extent that her testimony before the post-conviction court was different from her testimony at trial, the post-conviction court "discount[ed] it and continue[d] to believe the evidence she provided at trial."  As noted above, we defer to the reasonable credibility determinations made by the state post-conviction court.  *Lonberger*, 459 U.S. at 434.

THOMAS, Chief Judge, concurring in part and dissenting in part:

I agree with the majority that Mann is not entitled to relief on his claims of guilt-phase ineffective assistance of counsel. I respectfully disagree that he is not entitled to relief on his claim of ineffective assistance of counsel at sentencing. Therefore, I concur in part and dissent in part.

I

Before venturing into the dense thicket of AEDPA nuances, we must recognize at the onset that, although the law may not provide a remedy, Mann was sentenced to death under an unconstitutional sentencing scheme.

First, his death sentence was imposed by a judge, not a jury, under a system that the Supreme Court later declared unconstitutional as a violation of the Sixth Amendment right to trial by jury. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). Mann, of course, has no remedy for that constitutional infirmity because *Ring* does not apply retroactively. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

Second, he was sentenced during a period in which Arizona unconstitutionally precluded the consideration of mitigating evidence that lacked a "causal nexus" to the crime, in irreconcilable conflict with controlling Supreme Court Eighth Amendment jurisprudence as decided in *Eddings v. Oklahoma*, 455 U.S. 104 (1982). *McKinney v. Ryan*, 813 F.3d 798, 802 (9th Cir. 2015) (en banc). However, because neither Mann's trial nor Mann's post-conviction counsel raised this Eighth Amendment claim before the state

court, we are precluded from granting Mann direct relief on a meritorious constitutional claim.

Yet one more constitutional error infected Mann's sentencing: ineffective assistance of counsel. Mann's attorney did not investigate or present available and significant mitigating evidence to the sentencing judge. The majority does not seriously contest this constitutional error, but concludes that AEDPA deference prevents us from reaching the merits of that claim ourselves. I respectfully disagree that AEDPA precludes meaningful habeas review. I would reach the merits and grant relief.

## II

The state post-conviction court was required to assess Mann's ineffective assistance of counsel claim under *Strickland v. Washington*, which held that a criminal defendant's Sixth Amendment right to counsel is violated if the defendant's trial attorney performs deficiently and thereby prejudices the defendant. 466 U.S. 668, 687 (1984). However, the post-conviction court committed constitutional error in its consideration of the ineffective assistance of counsel claim in two respects: (1) it unconstitutionally applied a "causal nexus" test for consideration of mitigating evidence in violation of *Eddings*, and (2) it applied a "more likely than not" standard rather than the constitutionally required "reasonable probability" test in its assessment of prejudice in violation of *Strickland*.[1] The post-conviction

---

[1] Mann exhausted his *Strickland* claim by presenting it to the state post-conviction court and Arizona Supreme Court. The Arizona Supreme Court effectively adopted the post-conviction court's flawed *Strickland* analysis by summarily denying Mann's petition for review. *Ylst v.*

court's analysis of the *Strickland* claim in its decision was thus contrary to clearly established federal law as determined by the Supreme Court. Therefore, its decision is not entitled to AEDPA deference, and we should analyze the ineffective assistance claim *de novo* on the merits.

A

*Strickland* requires a state post-conviction court to "evaluate the *totality of the available mitigation* evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and reweigh it against the aggravating evidence to determine whether counsel's deficiency prejudiced the defendant. *Williams v. Taylor*, 529 U.S. 362, 397–99 (2000) (emphasis added).

Sentencers and reviewing courts may determine what weight to accord mitigating evidence, but "may not give [mitigating evidence] no weight by excluding such evidence

---

*Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). Mann was not required to exhaust his arguments regarding the standard of review this Court should apply to that *Strickland* claim. Indeed, Mann lacked "the right under the law of [Arizona] to raise" the question of the appropriate federal standard of review under AEDPA, as such an inquiry is only relevant in a federal habeas proceeding. *See* 28 U.S.C. § 2254(c) (requiring exhaustion of claims that can be adjudicated in the state court). Thus, because Mann properly exhausted his *Strickland* claim, we must assess whether the state court's *Strickland* analysis was contrary to federal law and thereby determine whether to apply AEDPA deference to our review of Mann's *Strickland* claim. *See Williams v. Taylor*, 529 U.S. 362, 397 (2000) (concluding that state court analysis was "unreasonable application of" *Strickland* based on embedded legal error that was neither raised nor briefed in the state court).

from their consideration." *Eddings*, 455 U.S. at 114–15. Rather, it is "[h]ighly relevant—*if not essential*—[to the] selection of an appropriate sentence" that the sentencer consider "the fullest information possible concerning the defendant's life and characteristics." *Lockett v. Ohio*, 438 U.S. 586, 602–03 (1978) (alterations in original) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). Accordingly, courts cannot require a capital defendant to "establish a nexus between [mitigating evidence] and [the] crime." *Tennard v. Dretke*, 542 U.S. 274, 287 (2004).

Yet, we know that throughout Mann's trial, sentencing, direct appeal, and post-conviction proceeding, Arizona courts "articulated and applied a 'causal nexus' test," contrary to *Eddings*, "that forbade as a matter of law giving weight to mitigating evidence, such as . . . mental condition, unless the . . . mental condition was causally connected to the crime." *McKinney*, 813 F.3d at 802–03 (concluding that Arizona courts applied a "causal nexus" test contrary to clearly established federal law from 1989 until approximately 2005). It was not until the Supreme Court held in *Tennard* that a similar Fifth Circuit test had "no basis in [Supreme Court] precedents and . . . [was] inconsistent with the standard [the Court] adopted for relevance in the capital sentencing context" that Arizona's practice changed. 542 U.S. at 287.

Shortly after *Tennard*, the Arizona Supreme Court recognized and applied a new rule eliminating the causal nexus requirement in *State v. Anderson*, 111 P.3d 369, 391 (Ariz. 2005). But during the period relevant to this case, Arizona post-conviction courts were applying the unconstitutional causal nexus test, and were thus unable to properly "reweigh" the totality of available mitigating and aggravating evidence as required by *Strickland*.

In this case, the post-conviction court applied a causal nexus test in violation of *Eddings*. First, we know that the post-conviction court was required to do so by state law, as the Arizona Supreme Court consistently articulated and applied a causal nexus test both before and after Mann's post-conviction proceeding. *McKinney*, 813 F.3d at 803. Just as federal courts must presume that state courts "know and follow" federal law, *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam), perhaps even more so, federal courts cannot "presume . . . lightly that a state court failed to apply *its own law*," here, an unconstitutional causal nexus test, *Bell v. Cone*, 543 U.S. 447, 455 (2005) (per curiam) (emphasis added). I cannot presume, nor do I believe, that the post-conviction judge would act contrary to controlling Arizona precedent.

Second, the record shows that the post-conviction court actually applied the causal nexus test to Mann's mitigating evidence. Indeed, the Court said so, stating "[t]he Court finds that Defendant has not proven the existence of a causal connection between the accident and its effects and the murders." Moreover, the post-conviction court and the State emphasized the causal nexus test throughout Mann's post-conviction proceeding. When clinical neuropsychologist Dr. James F. Comer testified about the results of Mann's neuropsychological evaluation, the judge asked Dr. Comer to clarify whether Mann's head injury could have affected the crime. Dr. Comer responded by stating that he was "making no direct, causal connection" between Mann's organic brain damage and the murders because that was "something . . . the court need[ed] to determine"—a response that suggests he understood the court's question to be legal, not factual. The State emphasized that colloquy in its oral argument at the close of evidence, noting that the "court specifically asked

Dr. Comer *the critical legal issue*, whether there's any nexus between any possible injury to the brain from that accident and to the crime." Indeed, when discussing Dr. Comer's findings, the State's post-conviction hearing memo cited *State v. Hoskins*, 14 P.3d 997 (Ariz. 2000), a case—as recognized by the majority—in which the Arizona Supreme Court "articulated and insisted on its unconstitutional causal nexus test." *McKinney*, 813 F.3d at 814–15.

The post-conviction court's written decision then directly responded to its own questioning of Dr. Comer and the State's invocation of the causal nexus test. The decision first addressed Mann's state law claim for resentencing, which could only be granted if "[n]ewly discovered material facts . . . probably would have changed the verdict or sentence." Ariz. R. Crim. Pro. 32.1(e). Then, as previously noted, the post-conviction court concluded that Mann had "not proven the existence of *a causal connection* between the accident and its effects and the murders." Rather, Mann had "committed the[] murders for pecuniary gain, not for reasons traceable to his 1985 accident." The post-conviction court thus concluded that Mann could not establish that any new evidence probably would have changed his sentence, as required for relief pursuant to Arizona Rule of Criminal Procedure 32.1(e). The post-conviction court's cursory ineffective assistance of counsel analysis then imported the reasoning from that state law resentencing analysis. The court concluded that Mann was not prejudiced by his counsel's failure to introduce evidence of the accident and Mann's attendant organic brain damage because "[a]dditional evidence that pertain[ed] to the 1985 accident and its effects [was] discussed . . . above, where th[e] Court found that it would not have changed the sentence imposed." That "discuss[ion] . . . above" turned

almost exclusively on the lack of "a causal connection
between the accident and its effects and the murders."

The post-conviction court did not use the phrase "causal
connection" to respond to "the core" of Mann's claims, as the
majority suggests. Mann did not argue that evidence relating
to the 1985 accident was relevant solely as a potential
contributing factor to the crime. Rather, Mann explicitly
argued at the post-conviction hearing that such evidence
"would have provided some *free-standing mitigation* of
itself." Once the post-conviction court concluded that there
was no causal connection, however, it did not consider and
respond to this additional mitigation argument. The court
failed to address how Mann's organic brain damage and
attendant personality change—apart from a causal nexus to
the crime—could have otherwise reduced his moral
culpability or altered his sentencing profile.

Further, I cannot presume that the post-conviction court's
invocation of the phrase "causal connection" was divorced
from the legal meaning given to that phrase by the Arizona
Supreme Court.[2] At the time of Mann's post-conviction

---

[2] The majority suggests that the post-conviction judge, who also
presided over Mann's trial, did not apply the causal nexus test during
Mann's trial and thus likely did not do so during Mann's post-conviction
proceeding. However, the appropriate standard of review under AEDPA
turns on the legal analysis of the court that adjudicated the claim at issue,
not analyses in prior and distinct proceedings. Moreover, during the
sentencing phase of Mann's trial, the prosecution repeatedly invoked the
causal nexus test, arguing that unless a mitigating factor "ha[d] a direct
causal tie" to the crime, the court did not "have to consider it." Although
brief, the trial court's sentencing memorandum suggests that it agreed with
the prosecution and, in accord with binding Arizona precedent, applied the
causal nexus test to Mann's non-statutory mitigating evidence. Thus,
consideration of the trial court record suggests that the post-conviction

proceeding, the term "causal connection" was a legal term of art, inextricably intertwined with the Arizona Supreme Court's unconstitutional causal nexus test. *See e.g.*, *State v. Martinez*, 999 P.2d 795, 808 (Ariz. 2000) ("[T]here was simply no *causal connection* between [the defendant's] personality disorder and his actions on [the day of the murder]." (emphasis added)); *State v. Sharp*, 973 P.2d 1171, 1182 (Ariz. 1999) ("Appellant failed to show a *causal connection* between [the mitigating evidence] and his actions on the night of the murder. We have previously explained that we require a *causal connection* to justify considering evidence of a defendant's background as a mitigating circumstance." (emphasis added)); *State v. Rienhardt*, 951 P.2d 454, 467 (Ariz. 1997) ("Since [the defendant] declined to present any evidence of a *causal connection* at his aggravation-mitigation hearing, we reject this mitigating factor." (emphasis added)). The post-conviction court referenced the lack of "causal connection" because it was required to do so by state law, not to respond to "the core" of Mann's claim. To suggest otherwise is to say that the court did not mean what it said.

In sum, the post-conviction court excluded from its prejudice analysis as a matter of law mitigating evidence that, irrespective of its relationship to the crime, could have shed light on Mann's moral culpability, contrary to clearly established federal law. *See Eddings*, 455 U.S. at 113. Therefore, its decision is not entitled to deference under AEDPA.

---

judge was aware of, and had previously applied in Mann's case, Arizona's unconstitutional causal nexus test.

B

The post-conviction court's prejudice analysis was also "contrary to" clearly established federal law because it applied the "more-likely-than-not" standard that *Strickland* rejected. 466 U.S. at 693–94. No one disagrees that it is constitutional error to apply a "more-likely-than-not" standard in analyzing prejudice because *Strickland* rejected that approach and instead established a "reasonable probability" standard. Specifically, *Strickland* held that to establish prejudice at the penalty phase of a capital proceeding, the petitioner must show that "there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. The Court explicitly held that a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome," not a probability that it is "more likely than not" the result would be different. *Id.* at 693–94.

Here, the post-conviction court denied Mann's ineffective assistance of counsel claim for the reasons "discussed" in its state law resentencing analysis, "where [the] [c]ourt found that [the new mitigating evidence] would not have changed the sentence imposed." At the time of the post-conviction court's decision, Arizona law limited resentencing to cases where "[n]ewly discovered material facts probably exist and such facts probably would have changed the verdict or sentence." Ariz. R. Crim. P. 32.1(e) (2000). "Probably" effectively meant "more likely than not." *See State v. Orantez*, 902 P.2d 824, 829 (Ariz. 1995) (concluding that new evidence "would have likely resulted in a different verdict" and thus "probably change[d] the verdict"). The post-

conviction court's ineffective assistance of counsel analysis did not invoke a different test for assessing prejudice. The most fair reading of the decision is therefore that the court denied constitutional relief for the same reason—and under the same procedural rules—that it denied state law relief: it probably would not "have changed the verdict or sentence imposed." Although the majority may be correct that the difference between the "more-likely-than-not" and "reasonable probability" standards is outcome determinative "in the rarest case," it is a difference that permits us to make that assessment *de novo*, rather than through AEDPA's deferential lens.

The fact that the post-conviction judge cited *State v. Nash*, 694 P.2d 222 (Ariz. 1985), an Arizona case that adopted *Strickland*'s "reasonable probability" standard, does not alter this conclusion. The post-conviction court's decision cites *Nash* only for the general idea that *Strickland* sets out the performance and prejudice test for Sixth Amendment claims, not to provide a specific prejudice standard distinct from the more-likely-than-not standard otherwise applicable under Arizona law and previously applied in the decision.

And even if the citation to *Nash* meant that the post-conviction court implicitly adopted the correct prejudice standard, it is not enough to cite *Strickland*—a court's analysis must reflect it too. The Supreme Court has held that even if a state court identifies the proper *Strickland* standard, by "failing to apply *Strickland* to assess the ineffective-assistance-of-counsel claim . . . raised, the state court's adjudication [is] contrary to clearly established federal law." *Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012). Here, it is apparent that the post-conviction court did not actually "apply

*Strickland* to assess" Mann's claim and reweigh the aggravating and mitigating evidence.

The only potential prejudice analysis is contained in the post-conviction court's state law resentencing discussion, which primarily notes Mann's pecuniary motive for the crime and the lack of a causal connection.  However, both of those observations are irrelevant to a proper reweighing of aggravating and mitigating factors under *Strickland*—the post-conviction court merely restated an established aggravating factor and otherwise failed to respond to Mann's contentions that the new evidence undermined the trial court's rejection of the non-statutory mitigating factor of remorse.  *See id.* (concluding that *Strickland* analysis was "contrary to" clearly established law in part because the court's analysis consisted of "irrelevant observation[s]").  The only potential prejudice analysis in the post-conviction court's opinion therefore suggests that the court did not actually place the powerful new mitigating evidence in the context of evidence established at trial and reweigh the totality of available mitigating evidence against the evidence in aggravation.  *Williams*, 529 U.S. at 397–98.

As a final note, the post-conviction court was not excused from its obligation to apply *Strickland* because the same judge presided over both Mann's trial and post-conviction proceeding, and that judge concluded that the newly introduced evidence would not have changed *his* mind.  *Strickland*'s prejudice analysis turns on a reasonable decisionmaker, not on the "idiosyncracies of [a] particular decisionmaker."  466 U.S. at 695.  Indeed, it would be odd to give weight to a single decisionmaker in this context, given that judge sentencing in capital cases is unconstitutional.  *Ring*, 536 U.S. at 609.

Additionally and significantly, in states like Arizona, where the state supreme court "conducts an independent review of the aggravating and mitigating factors, reweighing them afresh," *Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008), the post-conviction court must assess whether there is a reasonable probability that "the sentencer—*including an appellate court, to the extent it independently reweighs the evidence*—would have concluded that the balance of aggravating and mitigating factors did not warrant death." *Strickland*, 466 U.S. at 695 (emphasis added). The fact that the post-conviction court spoke in terms of absolutes rather than degrees of probability thus provides additional evidence that the court failed to "apply *Strickland* to assess" prejudice by reweighing the evidence from the perspective of a neutral and reasonable sentencer.

## C

In sum, the record demonstrates that the post-conviction court's prejudice analysis was contrary to clearly established federal law in two respects. Because the state court's decision is not entitled to AEDPA deference, I would review Mann's *Strickland* claim *de novo*.

## III

Reviewing the *Strickland* claim *de novo*, one can only conclude that Mann was denied his Sixth Amendment right to effective assistance of counsel and is entitled to habeas relief. As we know, to prevail on a claim for ineffective assistance of counsel, a defendant must first establish that "counsel's performance was deficient" and, second, that the "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Mann satisfies both of *Strickland*'s prongs.

A

Because the post-conviction court only reached *Strickland*'s prejudice prong, we must review *Strickland*'s deficiency prong *de novo*. *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam).[3]  Reviewing that prong *de novo*, one can only conclude that counsel's performance at sentencing was constitutionally deficient.

Counsel's performance is measured by "an objective standard of reasonableness," as determined by "prevailing professional norms."    *Strickland*, 466 U.S. at 687–88. Although there are no "specific guidelines" for measuring counsel's performance, *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting *Strickland*, 466 U.S. at 688), "general principles have emerged . . . that inform our view as to the 'objective standard of reasonableness' by which we assess attorney performance, particularly with respect to the duty to

---

[3] The Supreme Court's recent statement that "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated" does not require a different analysis. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Here, unlike the summary denial in *Richter*, the court knows which component of Mann's ineffective assistance of counsel claim—namely, prejudice—was addressed by the state court. This distinction between AEDPA review of summary denials and partial adjudications is apparent in post-*Richter* Supreme Court caselaw, which applies *de novo* review to unanalyzed portions of multi-prong tests. *See, e.g.*, *Brumfield v. Cain*, 135 S. Ct. 2269, 2282–83 (2015) (applying *de novo* review to unanalyzed portion of *Atkins* claim). Indeed, in *Brumfield*, the Court analogized the partial adjudication at issue to *Wiggins v. Smith*, 539 U.S. 510 (2003), where the state court's reasoned decision was "premised solely" on one of *Strickland*'s prongs, and distinguished the case from *Richter*, where there was no "opinion explaining the reason relief [was] denied." 135 S. Ct. at 2282–83.

investigate," *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005) (en banc).

Generally, for the penalty phase of capital proceedings, prevailing professional norms require counsel "to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396. As recognized in *Strickland*, the American Bar Association attorney standards serve as "guides" to determining what constitutes the requisite "thorough investigation." 466 U.S. at 688–90. At the time of Mann's sentencing, those standards provided that counsel's penalty phase investigation should "comprise efforts to discover all reasonably available mitigating evidence." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989).

Specifically, because evidence of mental impairment may place a defendant's character in context, thereby reducing a defendant's moral culpability, capital defense attorneys have a "duty to investigate and present mitigating evidence of mental impairment." *Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998). This standard practice was likewise reflected in the ABA guidelines at the time of Mann's trial, which provided that capital defense attorneys should investigate the defendant's "medical history." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(D)(2)(C) (1989). Therefore, the "[f]ailure to investigate a defendant's organic brain damage or other mental impairments may constitute ineffective assistance of counsel." *Caro v. Calderon* (*Caro I*), 165 F.3d 1223, 1226 (9th Cir. 1998).

As measured against these prevailing professional norms, counsel's penalty phase investigation fell below an objective

standard of reasonableness. The majority does not suggest otherwise.

Mann's counsel never investigated the circumstances or consequences of the 1985 accident, and made no effort to investigate whether Mann sustained organic brain damage. The failure to do so is unsurprising given that Mann's counsel admitted that he "was not focused on mitigation." Indeed, counsel never even requested that a background investigation or any long term research be performed with regard to Mann. Counsel declined to pursue such avenues of mitigation relief despite the Capital Representation Project's death penalty expert's recommendation to investigate whether Mann had "organic brain damage" and had been "self-medicating with drugs."

Mann's counsel also never attempted to obtain Mann's medical records, whether relating to the 1985 accident or otherwise. Yet, obtaining "readily available documentary evidence such as . . . medical records" is "fundamental to preparing for virtually every capital sentencing proceeding." *Robinson v. Schriro*, 595 F.3d 1086, 1108–09 (9th Cir. 2010). Mann's counsel recognized as much, and requested a continuance to obtain "all the records" counsel could "from prior schooling, *hospitalizations*, [Mann's] prior criminal record, and prior presentence reports."

Finally, Mann's counsel did not to speak with Karen Miller, again, contrary to the recommendation of the Capital Representation Project. Counsel was aware, however, that Miller lived with Mann for ten years, including both before and after the 1985 accident; that she was someone who "care[d] about" Mann; and that she observed a change in Mann's behavior during their relationship. Counsel

recognized the importance of their relationship and invoked it during his sentencing argument, noting that Mann "has tried to maintain some kind of a relationship with [Miller]" and that she "even went to the jail a couple times to visit" Mann. Counsel was thus aware that Miller "could have provided important background information" about Mann, "providing leads for further investigation," likely regarding the 1985 accident and its impact on Mann's character. *Robinson*, 595 F.3d at 1110. Like other instances where counsel fails to "even take the first step of interviewing witnesses or requesting records," counsel's decision not to investigate the circumstances or consequences of the 1985 accident "did not reflect reasonable professional judgment" subject to this Court's deference. *Porter*, 558 U.S. at 39–40.

If there could be any doubt that counsel's actions fell below an objective standard of reasonableness, it is obviated by counsel's concession at trial that such an investigation was the prevailing professional norm in the state of Arizona. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (concluding that counsel performed deficiently where counsel acknowledged the relevant professional norm); *see also Pinholster*, 563 U.S. at 196 (distinguishing *Wiggins* as a case in which "the defendant's trial counsel specifically acknowledged a standard practice for capital cases . . . that was inconsistent with what he had done"). When counsel requested a continuance, he told the court that a continuance was necessary so that counsel could fulfill his constitutional and state-law obligations to conduct a "comprehensive psychological profile and background investigation," and obtain "all the records" available, including those from

hospitalizations.[4]  Indeed, counsel conceded that the failure to conduct such an investigation would constitute "reversible error."  Yet, whether due to time constraints or "inattention," counsel never conducted the very investigation he described to the court as required by law.  *See Wiggins*, 539 U.S. at 526 (concluding that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment").

In the post-conviction proceeding, counsel did not attempt to insulate his failure to investigate Mann's medical history as a strategic decision.  But, even if he had done so, cloaking a decision as "strategic" does eliminate counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  It is often only after a preliminary investigation that "reasonably diligent counsel may draw a line [because] they have good reason to think further investigation would be a waste."  *Rompilla v. Beard*, 545 U.S. 374, 382–83 (2005).  After all, an "uninformed strategy is not a reasoned strategy.  It is, in fact, no strategy at all."  *Correll*, 539 F.3d at 949.

---

[4] Counsel requested a continuance because it was not until Mann was convicted that counsel "kind of realized . . . that it normally takes quite a few months to prepare a case for a sentencing."  This concession provides further evidence of counsel's deficiency.  "The failure to start the mitigation investigation until after the guilt phase flies directly in the face of the 1989 Guidelines, which directs an attorney to start preparing for sentencing as soon as he starts working on the case."  *Jones v. Ryan*, 583 F.3d 626, 644 (9th Cir. 2009), *vacated for reconsideration in light of Pinholster*, 563 U.S. 170, *by* 563 U.S. 932 (2011); *see* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(A) (1989) (stating that the penalty phase investigation should "begin immediately upon counsel's entry into the case").

Here, counsel did conduct a narrow mitigation investigation. He spoke with members of Mann's family to develop evidence of Mann's "unstable and abusive family background" and "positive relationships with his daughters and mother." Counsel also requested a "neutral" psychological evaluation, provided by a person who was neither "defense [n]or State oriented." However, "counsel's duty to investigate all potentially mitigating evidence related to a defendant's mental health [and] family background . . . is not discharged merely by conducting a limited investigation of [those] issues." *Lambright v. Shcriro*, 490 F.3d 1103, 1120 (9th Cir. 2007) (en banc). Particularly where, like here, counsel "uncovered no evidence in [his] investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Wiggins*, 539 U.S. at 525.

Indeed, the failure to investigate Mann's medical history could not be considered "strategic" in light of the mitigating evidence available to counsel. Mann's biographical reference to the 1985 car accident and attendant concussion put counsel on notice of potential powerful mitigating evidence of organic brain damage, especially when coupled with the Capital Representation Project's specific recommendation to investigate whether Mann suffered from brain damage. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. Any reasonable attorney would further investigate whether a car accident that left two out of three passengers dead resulted in any permanent physical or psychological damage to Mann, the sole survivor.

Counsel's failure to investigate the 1985 accident and whether Mann suffered any organic brain damage was neither reasoned nor strategic; it was objectively unreasonable. Therefore, Mann's counsel provided constitutionally deficient representation during the penalty phase of Mann's trial.

B

Counsel's failure to investigate and present mitigating evidence relating to the 1985 accident prejudiced Mann. If Mann's counsel had conducted a reasonable investigation, the sentencing judge would have learned about Mann's organic brain damage and ability to feel remorse, mitigators that could have affected the sentencer's view of Mann's moral culpability. Indeed, "[m]ore than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system." *Caro v. Woodford* (*Caro II*), 280 F.3d 1247, 1258 (9th Cir. 2002) (citing 4 William Blackstone, Commentaries, *24–25). Given the impact that classic mitigating evidence would have had on Mann's sentencing profile, the newly introduced evidence is more than "sufficient to undermine confidence" in Mann's death sentence. *Strickland*, 466 U.S. at 694.

To establish prejudice from counsel's errors during the sentencing phase of a capital trial, the petitioner must show "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. This requires the court to "couple the omitted evidence with the mitigating evidence presented at trial," and assess whether the omitted evidence might have influenced the sentencer's assessment of the defendant's moral culpability. *Caro II*, 280 F.3d at 1256–57. Evidence of brain injury is a classic form

of mitigating evidence and thus often alters the balance of aggravating and mitigating circumstances. *Correll*, 539 F.3d at 954.

Here, there was substantial evidence of organic brain damage that was not presented to the sentencing judge. According to post-conviction testimony, Mann lost consciousness for a few hours after the accident. Once in the hospital, Mann's doctors, which may have included up to five neurologists, expressed concern about Mann's head injuries. After the accident, Mann experienced symptoms associated with organic brain damage, including astro-projection and severe lingering headaches.

Mann's post-conviction neurological expert, Dr. Comer, also concluded that Mann had "cognitive deficits consistent with head injury." Dr. Comer effectively ruled out substance abuse as the cause of Mann's cognitive deficits because the "cluster of weak test performances that [Mann] demonstrated tended to occur almost entirely on tests that had been well-documented to be sensitive to the subtle effects of head injury." To further support that conclusion, both Mann and Miller presented evidence that it was only *after* the 1985 accident that Mann began using and selling cocaine, a conclusion consistent with Mann's presentence report. This compelling evidence suggests that Mann suffered organic brain damage in the accident, from which, according to Dr. Comer, he did not "successful[ly] recover[] emotionally and behaviorally." The newly adduced mitigating evidence thus would have permitted the sentencer to more accurately assess Mann's "character and record"—an "indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion). Indeed, it "is precisely the type [of mitigating evidence] most

likely to affect a [sentencer's] evaluation of the punishment" Mann should have received. *Caro I*, 165 F.3d at 1227.

The mitigating evidence relating to the 1985 accident would have been of particular import in Mann's case because Arizona courts "place significant weight on brain injuries as mitigating evidence." *Correll*, 539 F.3d at 950 n.3. Further, "a major personality change can amount to a mitigating factor in Arizona." *Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998); *see also State v. Rockwell*, 775 P. 2d 1069, 1079 (Ariz. 1989) (vacating death sentence in case where defendant's "violent and unpredictable behavior began after [a] tragic [motorcycle] accident"). Thus, although counsel's deficiency would be prejudicial in any case, it was particularly so here, where Mann's capital sentence was automatically reviewed by the Arizona Supreme Court.

Not only did evidence relating to the 1985 accident potentially reduce Mann's moral culpability, but that evidence also undermined factual and legal findings made by the state trial court. The record developed in the post-conviction proceeding eradicated the two factual pillars upon which the sentencing court based its legal conclusion that Mann did not establish the non-statutory mitigating factor of remorse, thus per se altering the balance of aggravating and mitigating factors established at Mann's trial.

At sentencing, the trial court concluded that Mann failed to establish the non-statutory mitigating factor of remorse. The court specifically noted Mann's description of the 1985 accident contained in his biographical letter, and stated that in the letter Mann "indicate[d] no remorse" for the death of his two passengers. The court then concluded that Mann was

"incapable of remorse." That conclusion collapses in light of the post-conviction record.

The post-conviction record demonstrates that Mann was capable of remorse and, indeed, expressed significant remorse following the 1985 accident. The medical records following the accident describe Mann as experiencing a "grief reaction." Mann described himself as "devastated" by the death of his passengers, especially the younger girl, whom he considered "like a sister." Miller said that Mann entered a depression after the accident, and that the death of his passengers "destroyed him." This evidence directly contradicts the sentencing court's factual finding that Mann did not experience remorse for the death of his passengers following the 1985 accident.

The court's reliance on psychological testimony was similarly flawed because the psychologist was not provided evidence indicating that Mann may have received a head injury and therefore lacked "the information necessary to make an accurate evaluation" of Mann's neuropsychological health. *Caro I*, 165 F.3d at 1226–27. The psychologist's diagnosis of anti-social personality disorder required ruling out organic brain damage, which he was unable to do because he lacked the critical information. The psychologist's opinion that Mann was an anti-social "psychopath" with "no conscience" was founded on a mistaken assumption of Mann's neuropsychological health. Thus, the post-conviction record entirely undermines the basis of the sentencing court's conclusion that Mann was "incapable of remorse," and its rejection of remorse as a non-statutory mitigating factor. Therefore, there is no question that Mann was directly prejudiced by counsel's failure to investigate and present

evidence of organic brain injury and Mann's actual remorse about the accident.

In sum, the post-conviction evidence materially altered the sentencing profile that was presented to the sentencing judge and to the Arizona Supreme Court on direct review. The mitigating evidence introduced in the post-conviction proceeding was not "largely duplicat[ive]" of the mitigating evidence introduced at trial, or otherwise of "questionable mitigating value." *Pinholster*, 563 U.S. at 200–01. Rather, it was pure, undiluted mitigation, different in kind from the "lay background and character evidence" introduced at trial. *Caro II*, 280 F.3d at 1257. Thus, particularly in light of Arizona law at the time of Mann's conviction, there is a reasonable probability that evidence relating to the 1985 accident would have altered the balance of aggravating and mitigating factors and resulted in Mann receiving a sentence other than death. Counsel's deficiency prejudiced Mann.

## IV

For these reasons, I respectfully disagree that Mann is not entitled to relief on his claim of ineffective assistance of counsel at sentencing. Accordingly, I concur in part and dissent in part.

CHRISTEN, Circuit Judge, joined by BERZON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority and the dissent that petitioner did not meet his burden of establishing a meritorious guilt-phase claim. As for petitioner's sentencing-phase claim, I fully join the dissent's Part IIA analysis and conclude that Mann is entitled to de novo review on his claim of ineffective assistance of counsel. The dissent meticulously traces the post-conviction court's treatment of Mann's mitigating evidence and conclusively establishes that the court did indeed apply the rule from *State v. Hoskins*, 14 P.3d 997 (Ariz. 2000) (en banc), a decision published by the Arizona Supreme Court less than a year before the court decided Mann's post-conviction petition. Though this was exactly the course urged by the prosecution, it doomed the post-conviction court's *Strickland* analysis because it unequivocally incorporated *Eddings* error. As the dissent makes plain, no speculation is required to conclude that the state court improperly weighed Mann's mitigating evidence; the court said so. The dissent's Part IIIA discussion of *Strickland*'s deficient performance prong is also compelling and I join it. But I ultimately conclude, as the majority does, that petitioner is not entitled to relief. In the end, I am not persuaded that petitioner met his burden of establishing that the errors he complains of prejudiced the outcome of his sentencing.