Dissent by Judge CALLAHAN
OPINION
BASTIAN, District Judge:
During the night of May 20, 1981, someone entered the apartment of Clifford and Nancy Morgan and brutally stabbed Nancy Morgan and their eight-year-old son to death. According to the State of California, that someone was James Edward Hardy. The State argued that theory at trial, obtaining a conviction and death sentence for Hardy. As it turns out, that someone was likely Calvin Boyd, a key prosecution witness at Hardy’s trial. Yet Hardy remains imprisoned, serving a life sentence.
The Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”) raised the standard of review for petitioners, greatly limiting the success rate of petitions for writs of habeas corpus.[1] Despite the demanding standard set by AEDPA for state inmates, this case does not present a close question — Hardy is entitled to a writ of habeas corpus pursuant to 28 U.S.C. § 2254.
Factual and Procedural History[2]
Clifford Morgan (hereinafter “Morgan”) lived in an apartment complex on Vose Street in Van Nuys, California, with his wife, Nancy, and their eight-year-old son. Morgan devised a sinister plan to have his wife and son killed so he could collect on their life insurance policies. He enlisted the help of Mark Anthony Reilly. Reilly also lived in the Vose Street apartments. Reilly agreed to Morgan’s plan and sought a partner for the murders. In exchange for this help, Morgan allowed Reilly to live in Morgan’s apartment and promised to allow Reilly to manage a bar that Morgan intended to open with the insurance proceeds.
After failing to recruit a kickboxer named Marc Costello, Reilly turned to another Vose Street resident, Calvin Boyd, and Boyd’s friend Marcus. According to Boyd’s trial testimony, Boyd eventually declined to participate in the murders because Reilly was unable to pay him with either money or cocaine in' advance. According to the State, Reilly then tried to recruit Hardy, telling twa friends that Hardy might assist him in the crime.
*1132 In May 1981, Morgan moved to Carson City, Nevada, ostensibly for business reasons but likely to establish an alibi. During the night of May 20 or morning of May 21, two people, allegedly Hardy and Reilly, used bolt cutters and a key to enter the Morgan residence. Nancy Morgan and her son were sleeping in a back bedroom. Both were stabbed to death. Experts testified that physical evidence suggested at least two persons were responsible for the slayings, which likely occurred between 3:30 and 5:30 a.m.
Michael Mitchell, Reilly’s roommate, testified that he returned to the Yose Street apartments and went to sleep sometime after 11:00 p.m. on May 20, 1981. Around midnight, he awoke and saw Hardy, Reilly, Colette Mitchell (no relation to Michael Mitchell), and Steven Rice (another neighbor) in the apartment that he shared with Reilly. Later, he heard male voices and heard the shower being used. The next morning, he observed wet towels in the bathroom, but he saw no evidence of blood.
Shortly after the murders, Reilly admitted his guilt to his then-girlfriend Debbie Sportsman and made incriminating statements to her. He told Sportsman that Nancy Morgan said “[pjlease don’t kill me,” that more than one perpetrator was involved, that bolt cutters had been used to cut the chain lock on the door, and that a fish knife had been used in the stabbings.
Morgan’s recent purchase of an unusually large amount of life insurance raised suspicions, as did two incriminating statements he made to a neighbor — that his wife was worth more dead than alive, and that he expected she would die before him. Sportsman’s testimony linked Reilly to Morgan and human blood was found on Reilly’s shoes. No physical evidence was found that linked Hardy to the murders. The. evidence against Hardy consisted largely of the testimony of Calvin Boyd and Colette Mitchell.
Calvin Boyd was the State’s key witness. He testified that shortly after the murders, Reilly admitted that he and Hardy were the killers. Boyd stated Reilly had showed him recently purchased bolt cutters. Boyd claimed he walked through Rice’s apartment the morning of the murders and saw Reilly and Hardy both sleeping — placing the two men together shortly after the crime. Boyd also saw Rice and Colette Mitchell (hereinafter “Mitchell”) in the apartment.
Mitchell was Hardy’s girlfriend at the time of the murders but not at the time of trial. She gave testimony indirectly linking Hardy to the crime. Her initial statements to law enforcement provided Hardy with an alibi, but she changed her story and admitted to perjury. Mitchell contacted Hardy in jail intending to assist him even after she was granted immunity for her testimony. At trial, Mitchell testified she was working at a restaurant on the night of the murders. Hardy, Reilly, and Rice met at the restaurant shortly after 9:00 p.m. and Mitchell served them drinks. They went to the Vose Street apartments around 10:00 p.m. to “party” and use cocaine. Mitchell admitted to doing several large lines of cocaine and drinking at least three beers via a “beer bong.” Mitchell testified to quarreling with Hardy and leaving Reilly’s apartment to go next door. Sometime between midnight and 2:00 a.m., Rice and Mitchell left the apartments to purchase more beer. After returning, Hardy sought her out at Rice’s apartment and told her not to leave because he needed her that night. Despite having an unusually large amount of cocaine — which often would keep her awake — she passed out in Rice’s apartment and did not wake until 11:00 a.m. the next day. When she awoke, *1133 Hardy was asleep next to her and Reilly was asleep on a sofa.
Mitchell initially told police she had been with Hardy the entire night. At trial, she claimed she was either asleep or passed out for most of the night and did not know if Hardy left the apartment or not. Mitchell claimed Reilly once told her that he and Hardy had left the apartment while she slept but that another time Reilly told her they had not left. Mitchell testified she and Hardy discussed his alibi “all the time.” Mitchell stated Hardy led her to believe he was going to steal something from someone to enable a third person to collect on an insurance policy. Hardy supposedly told her at least twice that he had been to the victims’ home on the night of the murders. Hardy claimed he knew the victims were alive when he was there because he heard them snoring. On another occasion, Hardy told Mitchell the victims had already been killed by the time he entered the apartment. Mitchell testified that Hardy said “we were at the house,” but she also stated that he told her “he didn’t do it.” Mitchell testified that Reilly admitted to her that he knew who the killer was and it was not Hardy.
Mitchell claimed Hardy said a chain on a door would be cut to give the crime the appearance of a robbery. According to Mitchell, Hardy was to receive a portion of $40,000 or $50,000, but he actually only received $1,000. Mitchell testified she, or someone else, put the $1,000 in a cedar box. Mitchell said Hardy made several other statements: Morgan was not worried about the trial because during the delay his insurance proceeds were earning interest; the less she knew about the crime the better off she would be; Reilly was in charge of the situation; Hardy knew for a fact only one person committed the murders; Hardy took something from Morgan’s apartment to make it look like a robbery; and the killers used bolt cutters. According to Mitchell’s testimony, Hardy asked her and Hardy’s brother to retrieve and dispose of an Ml carbine from Hardy’s apartment; a firearm of the same style was reported missing from the crime scene. Mitchell also testified that Hardy asked her to destroy some of his shoes after he learned police found a shoeprint at the scene.
At trial, Hardy’s attorney, Michael Dem-by, gave no opening statement and presented no evidence on Hardy’s behalf. The jury was instructed that individuals who directly and actively committed the act constituting the crime, those who aided or abetted the commission of the crime, and those who advised and encouraged its commission were equally guilty. An additional aid-and-abet instruction was also given.
Hardy, Reilly, and Morgan were convicted of two counts of first degree murder and one count of conspiracy to commit murder to collect life insurance proceeds. Six special circumstances were found by the jury. The defendants were not convicted on a burglary charge. A joint penalty phase was held for Hardy and Reilly— both were sentenced to death. Morgan died of cancer before he could be sentenced.
On appeal, the California Supreme Court vacated one of the special circumstances but affirmed the judgment in all other respects. The United States Supreme Court denied a petition for writ of certiorari. Hardy v. California, 506 U.S. 987, 113 S.Ct. 498, 121 L.Ed.2d 435 (1992).
On July 26, 1991, Hardy filed a petition for writ of habeas corpus in the California Supreme Court. That court issued an order to show cause why Hardy was not entitled to penalty phase relief because his trial counsel failed to call available mitigation witnesses. On April 28, 1993, the California Supreme Court ordered the Los Angeles County Superior Court to hold a *1134 reference hearing and make findings of fact.
The superior court judge heard evidence over several months in 1996 and 1997, where a very different story than the one presented at trial emerged. According to a number of credible witnesses, Boyd made very incriminating statements after the murders, Boyd’s alibi for the night of the murders was a sham, and Hardy had refused to participate in the crimes.[3] On September 16, 1999, the superior court entered findings of fact and conclusions finding Demby performed deficiently when he failed to investigate and present evidence that (a) Calvin Boyd, a key prosecution witness, was the actual killer, and (b) the murders occurred at a time when Hardy could not have been present.
On May 3, 2000, Hardy filed his Supplemental Allegation to Conform the Pleadings to the Proof, arguing that evidence from the reference hearing also required guilt phase relief. The California Supreme Court issued an order directing the State to show cause why Hardy was not entitled to reversal of his conviction “because he is innocent of the capital crimes of which he was convicted, because a third party named Calvin Boyd committed the murders, and because [Hardy’s] trial counsel rendered constitutionally ineffective assistance of counsel by failing to present evidence demonstrating [Hardy’s] innocence.” Both of Hardy’s state habeas petitions were consolidated for argument and opinion.
On July 26, 2007, the California Supreme Court decided the consolidated petitions. Although that court recognized that the disturbing revelations about Boyd “presented a more difficult decision for the jury and may well have created in the minds of the jurors a reasonable doubt as to petitioner’s guilt,” it found Hardy could not meet the very difficult burden of an actual innocence claim. Hardy II, 41 Cal.4th at 1017-18, 63 Cal.Rptr.3d 845, 163 P.3d 853. As to ineffective assistance of counsel, the California Supreme Court granted Hardy’s claim that Demby’s performance was deficient at both the penalty and guilt phases of the trial. The court reversed Hardy’s death sentence but found Demby’s inadequate representation at the guilt phase did not prejudice Hardy because there was “substantial evidence” to convict him under an aid-and-abet or conspiracy theory. Id. at 1029-30, 63 Cal.Rptr.3d 845, 163 P.3d 853 (“We conclude substantial evidence supports the theory that petitioner was guilty of first degree murder on a conspiracy theory.”). The court also rejected Hardy’s actual innocence claim.
The California Supreme Court order specifically adopted several factual findings from the reference hearing, including: (1) Raynell Burney, Rickey Ginsburg, James Moss, Sandra Moss, Michael Small, and Steven Rice testified credibly regarding various incriminating statements and actions made by Boyd; (2) Boyd was not a credible witness; (3) Boyd habitually carried a knife similar to the murder weapon; (4) Boyd had previously committed several assaults with a knife; (5) Boyd had cuts on his hands after the killings; (6) Boyd’s alibi was false; (7) Boyd had motive to commit murder; (8) Boyd testified falsely when he stated at trial that the prosecutor had not promised him anything in connection with his testimony when he was actually granted immunity; and (9) Boyd likely had a *1135 role in the murders, very possibly a primary one.
After the State chose not to retry the penalty phase, Hardy was resentenced to consecutive terms of life in prison without the possibility of parole. He was resen-tenced to twenty-five years to life on the conspiracy charge.
On September 6, 2011, Hardy timely filed a pro se petition for writ of habeas corpus in the United States District Court for the Central District of California. A magistrate judge ordered responsive briefing but denied Hardy’s request for appointment of counsel. On May 7, 2013, the magistrate issued a report and recommendation denying all claims. On June 24, 2013, the district court accepted the report and entered judgment denying the petition. The district court issued a certificate of appealability as to “[wjhether the state supreme court reasonably concluded that Hardy was not prejudiced as a result of his counsel’s failure to uncover and expose the fact that a key government witness, Calvin Boyd, was probably the person who committed the murders.” This appeal was timely filed.
Standards of Review
A district court’s decision to grant or deny a habeas corpus petition under 28 U.S.C. § 2254 is reviewed de novo. Brown v. Ornoski, 503 F.3d 1006, 1010 (9th Cir. 2007); Shumway v. Payne, 223 F.3d 982, 984 (9th Cir. 2000). Facts found by the district court are reviewed for clear error. Tapia v. Roe, 189 F.3d 1052, 1055 (9th Cir. 1999).
AEDPA applies because the petition was filed after the passage of that law. Jeffries v. Wood, 103 F.3d 827, 827 (9th Cir. 1996). Under AEDPA, relief may only be granted if the state court decision in question was either “contrary to, or involved an unreasonable application of, clearly established Federal law” or was “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” § 2254(d)(1) — (2).
Analysis
The question now is whether the California Supreme Court decision was contrary to, or involved an unreasonable application of, clearly established federal law. The answer is yes; the California Supreme Court decision was contrary to established federal law. Alternatively, we also conclude that the California Supreme Court decision was an unreasonable application of clearly established federal law.
I.
The “clearly established federal law” for an ineffective assistance of counsel claim under the Sixth Amendment derives from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see Cullen v. Pinholster, 563 U.S. 170, 189, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (“There is no dispute” that Strickland is clearly established federal law). Strickland established a two-part test: the defendant must show (1) counsel’s performance was deficient, and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
The first prong of Strickland is not contested here. The California Supreme Court concluded that Demby rendered deficient performance by failing to investigate and present evidence that Boyd was likely the actual killer.[4] Because neither party ques *1136 tions this conclusion, this Court need only review the findings under the second prong of Strickland, which the parties contest.
Under § 2254(d)(1), “contrary to” means “substantially different from the relevant precedent” of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). As an example, the Supreme Court explained that if a state court denied an ineffective assistance of counsel claim for failure to show prejudice by a preponderance of the evidence standard rather than by a reasonable probability of a different result standard, the state court’s ruling would be “contrary to” the clearly established federal law in Strickland because the state court would be applying a stricter standard. Id. 405-06, 120 S.Ct. 1495. This case presents a nearly identical set of circumstances.
The California Supreme Court held that Hardy did not demonstrate the level of prejudice required under Strickland. The court concluded that even without Boyd’s testimony, and even if Demby had proven to the jury that Boyd was the actual murderer, substantial evidence remained to permit a jury to find Hardy guilty of murder under an aid-and-abet or conspirator theory.
Although the California Supreme Court recited the Strickland standard, it concluded that because there was “substantial evidence” against Hardy he suffered no prejudice from Demby’s deficient performance. This was not the correct standard, and consequently, the relevant question regarding prejudice at the guilt phase was never properly addressed.
Substantial evidence is “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” [5] Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). By applying this standard, the state court created a much higher bar for Hardy than the law required. Under Strickland, the court must ask “whether there is a reasonable probability that, absent the errors [by counsel], the factfinder would have had a reasonable doubt respecting guilt.” 466 U.S. at 695, 104 S.Ct. 2052. A reasonable probability is “sufficient to undermine confidence in the outcome” and must be substantial, not just conceivable. Id. at 693-94, 104 S.Ct. 2052. This standard does not mean a petitioner must demonstrate “that counsel’s actions more likely than not altered the outcome.” Harrington v. Richter, 562 U.S. 86, 112, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (citing Strickland, 466 U.S. at 693, 104 S.Ct. 2052) (internal quotation marks omitted). Requiring a habeas petitioner to demonstrate that had counsel performed adequately there would not have been sufficient evidence for a jury to convict is more akin to a Fed. R. Crim. P. 29 motion for a judgment of acquittal and has no place in the Strickland test. To the extent that the California Supreme Court found the Strickland prejudice prong was not met because substantial evidence remained to convict Hardy under a different theory, it applied a standard contrary to clearly established federal law.
This case differs substantially from Mann v. Ryan. No. 09-99017, 828 F.3d *1137 1143, 2016 WL 3854234 (9th Cir. July 15, 2016) (en banc). In Mann, this Court found that the state court’s opinion was ambiguous as to whether it was employing the proper Strickland standard. Id. at 1156—58, 2016 WL 3854234 at *11. The most logical inference in Mann, however, was that the state court judge — -who was also the original sentencing judge — applied the proper standard but recited the standard incorrectly. Hardy’s case presents the inverse. Here, the state court correctly recited the Strickland standard but then, in its application, abandoned it — replacing it with a substantial evidence standard. As the Supreme Court has made clear, it is the application, not the recitation of a standard that matters for § 2254(d) purposes. See Sears v. Upton, 561 U.S. 945, 952, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010) (per curiam) (“Although the Court appears to have stated the proper [Strickland] prejudice standard, it did not correctly conceptualize how that standard applies to the circumstances of this case.”) (footnote omitted). It is apparent on the surface of the California Supreme Court’s decision that it applied an incorrect standard and no inferences need be, nor can be drawn, that could result in finding the state court applied the proper standard. See Mann, 828 F.3d at 1156-58, 2016 WL 3854234 at *11.
Hardy’s petition satisfies the “contrary to” clause of § 2254(d)(1) because the California Supreme Court employed a standard of review which was significantly harsher than the clearly established test from Strickland. Id. (“Had the state post-conviction court applied [a stricter standard] to analyze [Petitioner’s] ineffective assistance of counsel claims, its opinion would have been contrary to clearly established federal law under AEDPA.”). Because the state court used the wrong standard, we need not defer to that decision. See Panetti v. Quarterman, 551 U.S. 930, 948, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (explaining that when § 2254(d)(1) is satisfied, a court may review a petition “unencumbered by the deference AEDPA normally requires”). In other words, this Court may analyze Hardy’s constitutional claim de novo pursuant to § 2254(a). Frantz v. Hazey, 533 F.3d 724, 735-37 (9th Cir. 2008) (explaining the two step process under AEDPA).
II.
Under de novo review, Hardy was clearly prejudiced in the guilt phase by Demby’s deficient performance. Had Dem-by properly investigated and presented evidence that Boyd — the state’s key witness — actually committed' the murders, there is a substantial probability the jury would have come to a different conclusion. Hardy is entitled to habeas relief because the California Supreme Court applied a standard contrary to clearly established law and because his attorney’s deficient performance was prejudicial at the guilt phase.
At trial, the State’s théory of the case centered on the existence of an “elaborate scheme or plan or design by Mr. Morgan[,] coupled with Mr. Reilly as'the middleman[, which] culminated in the hiring of Mr. Hardy or the agreement by Mr. Hardy to go with Mr. Reilly to do the killing.” That is, Morgan hired Reilly to kill his family, Reilly then recruited Hardy, and the two entered Morgan’s apartment where Hardy killed Morgan’s wife and son. The State argued that Boyd and his friend Marcus had originally been enlisted to burglarize the Morgan residence but had ultimately withdrawn from the scheme.
According to the California Supreme Court, Boyd provided “tiro critical pieces of evidence” at trial: (1) Boyd testified that Reilly told Boyd that Habdy was the killer, and (2) Boyd saw Hardy and Reilly together just a few hours after the murder at Rice’s apartment.
*1138 Most of the other evidence presented against Hardy at trial came from Mitchell. Sportsman also testified that Hardy and Reilly spent a lot of time drinking and doing drugs together during the weeks surrounding the murders.
We note that the California Supreme Court actually did address the prejudicial effect of Demby’s performance but only in relation to Hardy’s actual innocence claim — not as to his ineffective assistance claim. The California Supreme Court found the weight and breadth of the evidence regarding Boyd’s likely participation in the murder “would have presented a more difficult decision for the jury and may well have created in the minds of the jurors a reasonable doubt as to [Hardy’s] guilt.” The evidence regarding Boyd’s likely participation — which included evidence Boyd made incriminating statements before and after the murder, had a false alibi, carried a knife similar to the murder weapon, and had previously committed assaults — is precisely the same evidence that Hardy argues Demby should have investigated and presented at trial. The fact that the California Supreme Court acknowledged, in relation to Hardy’s innocence claim, how such evidence would have created a reasonable doubt as to Hardy’s guilt is equally applicable to Hardy’s ineffective assistance of counsel claim.
Nonetheless, the California Supreme Court held Hardy was not entitled to relief on the ineffective assistance of counsel claim because substantial evidence supported a theory Hardy was guilty of first degree murder on a conspiracy theory and on an aid-and-abet theory. Because Hardy was found guilty on a conspiracy charge, and because an aid-and-abet jury instruction was given along with the murder charge, the California Supreme Court concluded no prejudice occurred. Under de novo review, the California Supreme Court clearly erred.
First, as noted, the State’s entire theory of the case hinged on Hardy being the actual killer. Under no reasonable reading of the record could it be concluded the jury actually found. Hardy guilty under an aid- or-abet theory. When the prosecutor addressed the aid-and-abet theory in his closing argument, he described only Morgan’s and Reilly’s involvement — not Hardys. Although the jury instruction regarding the murder charge included an aid-and-abet instruction and the jury found Hardy guilty of the murder charge, an aid-and-abet theory is wholly distinct[6] from an actual killer theory and the jury could not simultaneously have found both true.[7] Had Demby presented evidence that Boyd was the killer it would have completely under *1139 mined the prosecution’s theory of the case. As a result, there is a significant likelihood the jury would not have found that Hardy was guilty of murder beyond a reasonable doubt.
Further, the California Supreme Court found that “[ejvidence of Boyd’s incriminating admissions, coupled with other evidence, could have convinced a reasonable jury to entertain some doubt as to the extent of [Hardy’s] participation in the murders.” The California Supreme Court also stated that had Boyd’s participation been revealed at trial it would have “throw[n] some doubt on the scope of [Hardy’s] role — said by the prosecutor, at trial to be a primary one — in the crimes.” These statements indicate the state court believed a jury would have seriously questioned what role, if any, Hardy had in the murders, including under an aid-and-abet theory, had Demby not performed defi-ciently as Hardy’s attorney.
Second, although Hardy was found guilty by the jury of conspiracy to commit murder for insurance proceeds, his conviction rested on being the actual killer. The California Supreme Court found the jury relied — at least in part — on a conspiracy theory in convicting Hardy and that sufficient evidence supported the theory. This theory fails for the same reasons the aid- and-abet theory fails. The prosecution argued Hardy was a member of the conspiracy because he agreed to, and actually did, commit the murders.[8] Any remaining evidence linking Hardy to other minor acts involved in the conspiracy does little to rebut that the prosecution’s theory at trial would have been eviscerated had Demby not been deficient.
Additionally, there was at least some evidence adopted by the California Supreme Court that, even if Hardy was involved in the conspiracy at one point, he may have withdrawn from the conspiracy before the commission of the crimes. Hardy may have backed out before the crime was committed because, according to Boyd, Hardy was too “chicken shit to go along.” Whether this withdrawal would have occurred before any overt acts were taken — and therefore been effective — is unclear but it is additional evidence adopted by the state court that would cause a jury to view the conspiracy charge differently. Again, whether the jury could have or even likely would have convicted Hardy under this theory of, conspiracy is irrelevant; what matters is the substantial likelihood the jury may not have convicted Hardy had Demby investigated and presented evidence about Boyd’s participation in the crime.
Third, even if the aid-or-abet and conspiracy theories of guilt could supplant what the jury found at trial — that Hardy was the actual killer — it is reasonably likely the jury would have had a reasonable doubt under those theories based on the evidence that should have been presented at trial. The California Supreme Court’s contrary conclusion was incorrect and is unsupported by the record. According to the state court, the substahtial evidence that remained to convict Hardy under derivative theories consists almbst entirely of Mitchell’s testimony and a feW circumstantial statements made by Sportsman.
In support of its finding, the California Supreme Court cites Sportsman’s testimony linking Reilly to the murders. Sportsman testified that the day after the murders she saw Reilly and Hardy laughing and drinking. Sportsman also testified that Reilly encouraged her to speak to Hardy and Mitchell to coordinate alibis. Accord *1140 ing to Sportsman, Hardy and Reilly started drinking and doing drugs together ten days before the murders.
Beyond Sportsman’s testimony, the California Supreme Court relied solely on Mitchell to provide the “substantial evidence” that Hardy is guilty under a derivative theory. Mitchell testified that Hardy discussed his alibi frequently and that Hardy knew several details about the crimes. Most incriminatingly — according to the California Supreme Court — was that Hardy possessed $1,000 in $100 bills after the murders and that he instructed Mitchell to dispose of his shoes and an Ml carbine. The state court, however, recognized the weakness of Mitchell’s testimony — discounting most of it point-by-point. The court noted Mitchell “did not know where the money came from, could not remember who informed her of the money’s origin, and could not remember the first time she saw the money.” The California Supreme Court added “[t]he persuasive power of [Mitchell’s] testimony was further undermined by the fact she was subject to impeachment due to her drug and alcohol use and that she admitted lying for [Hardy] at his preliminary hearing.”
The California Supreme Court found that Sportsman’s and Mitchell’s testimony could support a finding that Hardy was guilty under a derivative theory assuming the jury found the testimony credible and persuasive. As previously explained, however, this is not the correct standard. The question is whether, if Demby had not performed deficiently, it is reasonably likely the jury would have reached a different outcome. Although the federal district court concluded that the jury specifically found Mitchell credible and relied on her testimony, this conclusion was purely speculative and not supported by the record. See Strickland, 466 U.S. at 695, 104 S.Ct. 2052 (“[E]vidence about the actual process of decision, if not part of the record of the proceeding under review ... should not be considered in the prejudice determination.”). At least one juror stated that the jury specifically discussed Mitchell’s testimony and determined she was not credible. Further, Mitchell’s testimony would have been discounted by the jury had Demby presented evidence that Boyd’s testimony, which corroborated much of Mitchell’s testimony, was false.
The California Supreme Court described Boyd’s crucial role in Hardy’s trial calling it “extremely damaging to [Hardy’s] case” and stating that he provided evidence “on which the prosecution relied to convict [Hardy].” Removing Boyd’s extremely damaging testimony and its corroborating effect on Mitchell’s testimony would have significantly changed the case as presented to the jury. Despite some evidence remaining that Hardy may have somehow been involved in the murders under a derivative theory, had Demby not performed defi-ciently, there is a substantial likelihood the jury would have had a reasonable doubt concerning Hardy’s guilt.
Last, Strickland’s prejudice prong requires analyzing the evidence that would have been presented had counsel not performed deficiently. Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995). Strickland held:
a court hearing an ineffectiveness claim must consider the totality of the evidence before the ... jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have- had a pervasive effect on the inferences to be drawn irom the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the rec *1141 ord is more likely to have been affected by the errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.
466 U.S. at 695-96, 104 S.Ct. 2052. Strickland does not permit the court to reimag-ine the entire trial. We must.leave undisturbed the prosecution’s case. We only envision what Demby should have presented in Hardy’s defense and determine how that would have altered the trial. In doing so, we may not invent arguments the prosecution could have made if it had known its theory of the case would be disproved. •
Here, this means the State would have called Boyd to the stand to testify that Hardy was the actual killer. Then Demby would have • cross-examined Boyd, revealing compelling evidence that Boyd, not Hardy, was the actual killer. Though we might assume the State would attempt to rehabilitate Boyd as a witness, we cannot simply presume it would have been successful in doing so. Nor can we presume the State would have altered the entire theory of its case in response or been successful doing so. If the State had changed horses midstream, that alone would have created a substantial probability the jury would come to a different result. Demby’s failure to investigate Boyd’s role in this case altered the entire evidentiary picture. Viewing the trial in this manner, the California Supreme Court and the federal district court erred in finding there was no reasonable probability that the outcome would have been different but-for the deficient performance of counsel under any theory of conviction.[9]
This is not a case where ‘counsel’s deficient performance had no bearing on the outcome due to otherwise strong or overwhelming evidence of guilt. See, e.g., United States v. O’Neal, 937 F.2d 1369, 1376 (9th Cir. 1990) (no prejudice where there was strong evidence of guilt), abrogated on other grounds by United States v. Garcia-Cruz, 40 F.3d 986, 989 (1994); United States v. Harden, 846 F.2d 1229, 1232 (9th Cir. 1988) (no prejudice where there was overwhelming evidence of ^uilt). Instead, the verdict was only weakly, supported by the evidence. No witness except Boyd placed Hardy at the scene of the crime, no witness reported seeing Hardy leaving the apartment complex the night of the crime, and no blood, fingerprint, footprint, hair, or other forensic evidence linked Hardy to the crime. No murder weapon was found and no evidence was presented that linked Hardy to any knife similar tp the one used by the killers. Indeed, no physical evidence whatsoever linked Hardy to the crime. Hardy was convicted of being the actual killer primarily on the strength of Boyd’s now discredited testimony. It cannot be reasonably argued that strong or overwhelming evidence of guilt under any theory exists without Boyd’s testimony. Thus, there is a substantial likelihood that the jury would not have convicted Hardy had Demby performed effectively.
III.
Even though the California Supreme Court recited the proper Strickland prejudice standard, it failed to apply the proper *1142 standard, and thus the decision is not protected from review for 28 U.S.C. § 2254(d) purposes. See Sears, 561 U.S. at 952, 130 S.Ct. 3259 (2010). Assuming, however, that the California Supreme Court did correctly conceptualize and apply the Strickland prejudice standard but simply camouflaged that understanding with a different — and incorrect — phrasing of the legal standard, we still conclude that its application was unreasonable.
Prior to the passage of AEDPA, federal courts reviewed state court convictions for habeas consideration using a standard akin to de novo review. See Brown v. Allen, 344 U.S. 443, 500-03, 73 S.Ct. 397, 97 L.Ed. 469 (1953). AEDPA revised the standard of review limiting a federal court’s review of state court decisions which are “contrary to, or involved an unreasonable application of, clearly established Federal law.” § 2254(d).
Three distinct terminologies have emerged to describe the “unreasonable application” portion of § 2254(d). The Supreme Court has described this standard as objective unreasonableness, double deference, and the fairminded jurist test. Although this may appear as simply a “matter of phrasing,” its discussion is necessary because “phrasing mirrors thought, and it is important that the phrasing not obscure the true issue” before the Court. Wright v. West, 505 U.S. 277, 304-05, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (O’Connor, J., concurring) (quoting Brown, 344 U.S. at 501, 73 S.Ct. 397). Regardless of which conception of “unreasonable application” is applied, the result is the same in this case— the California Supreme Court applied the Strickland prejudice test in an unreasonable fashion.
In Williams, the Supreme Court explained that “unreasonable” is a common term in the legal world and is to be measured objectively in the AEDPA context. Williams, 529 U.S. at 409-10, 120 S.Ct. 1495. Although the term “unreasonable” may be difficult to define in some scenarios, we know it means more than being merely erroneous or incorrect. Id. at 410-11, 120 S.Ct. 1495.
Later, in explaining how § 2254(d) interacts with the Strickland test, the Supreme Court introduced the concept of “double deference.” Double deference refers to the layering of the reasonableness test from § 2254(d) on top of another reasonableness test, such as the deficiency prong of Strickland’s two part standard. Because only the prejudice prong is at issue here, double deference does not apply.[10]
More recently, the Supreme Court expressed the AEDPA standard slightly differently. In Harrington v. Richter, the Court phrased the application of Strick *1143 land under § 2254(d)(1) as “whether it is possible fairminded jurists could disagree” that theories or arguments the state court could have relied on were inconsistent with a prior Supreme Court decision. 562 U.S. 86, 101-02, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). This “fairminded jurist” phrasing has oft been repeated since Richter in the AEDPA/Strickland context. See, e.g., Davis v. Ayala, — U.S. -, 135 S.Ct. 2187, 2199, 192 L.Ed.2d 323 (2015); Pinholster, 563 U.S. at 188, 131 S.Ct. 1388; Andrews v. Davis, 798 F.3d 759, 774 (9th Cir. 2015).
In Williams, the Supreme Court explained that the “reasonable jurist” standard is an objective standard and is not the proper standard for determining what amounts to an “unreasonable application” under § 2254(d)(1). 529 U.S. at 409, 120 S.Ct. 1495 (“The placement of this additional overlay on the ‘unreasonable application’ clause was erroneous.”). Because Richter cited Williams approvingly, and because no Supreme Court decision has overruled Williams, it is clear that the “fairminded jurist” language in Richter is just an alternative way to describe the objective unreasonableness standard elucidated in Williams and not a new subjective standard.[11]
Applying an objective fairminded jurist standard does not mean that because any state judge found otherwise, the federal court is obliged to turn away a petitioner. Cf. Wright v. West, 505 U.S. 277, 304, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (O’Connor, J., concurring). Indeed, to do so would wholly negate § 2254 and function as a suspension of the writ of habeas corpus for state prisoners. It would mean that even were a state prisoner granted a writ by a state trial court, the government could appeal all throughout the state process and lose each step of the way but so long as one jurist on either the state appellate court or state supreme court dissented, any federal petition would be doomed to failure. Courts are to read laws in order to give them meaning, not to render them fully impotent. See Williams, 529 U.S. at 404, 120 S.Ct. 1495.
Under any reading of § 2254(d), we conclude that Hardy is entitled to relief. We must determine whether the California Supreme Court applied the prejudice prong of Strickland in an unreasonable manner. It did.
The relevant inquiry under Strickland’s prejudice prong is “whether it is reasonably likely the result would have been different” had counsel not performed deficiently. Cannedy v. Adams, 706 F.3d 1148, 1162 (9th Cir. 2013) (quoting Harrington, 562 U.S. at 111-12, 131 S.Ct. 770). A court must “compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately.” Thomas v. Chappell, 678 F.3d 1086, 1102 (9th Cir. 2012) (quoting Karis v. Calderon, 283 F.3d 1117, 1133 (9th Cir. 2002)). As described in detail in part II, if Demby had provided effective assistance of counsel, the State’s theory of the case that Hardy was the actual killer would have been eviscerated. If Demby had investigated Boyd and then presented evidence that he made incriminating statements before and after the murder, and that his alibi was false, the jury would have been torn between two conflicting theories on the identity of the second killer. This would have created a reasonable doubt as to Hardy’s guilt. To the extent the California Supreme Court *1144 concluded there was not a substantial likelihood of a different result, it did not simply arrive at an incorrect conclusion about prejudice but it applied the Strickland prejudice prong in an objectively unreasonable mariner.
Hardy is entitled to relief based on the severity of Demby’s deficiency, the vital role Boyd’s testimony played in securing Hardy’s convictions, the lapses of the prosecution, and the utter dearth of other evidence inculpating Hardy.
Conclusion
Hardy was deprived of effective assistance of counsel at his trial and has demonstrated Strickland prejudice therefrom. Hardy’s attorney failed him, and the State of California failed Hardy by putting a man on the stand that it should have known committed the crime. We are not in a position to determine if, or to what extent, Hardy may have been involved in these heinous murders. But we can, and do, find that when the California Supreme Court failed to find ineffective assistance of counsel, its denial of Hardy’s claim was both contrary to and objectively unreasonable under Strickland. Accordingly, Hardy is entitled relief under AEDPA. We REVERSE the district court’s judgement and REMAND the case to the district court with instructions to grant the petition for a writ of habeas corpus.
REVERSED and REMANDED.

. See, e.g., John H. Blume, AEDPA: The “Hype" and the “Bite,” 9 Cornell L. Rev. 259 (2006); Lee Kovarsky, AEDPA's Wrecks: Comity, Finality, and Federalism, 82 Tul. L. Rev. 443 (2007); Judith L. Ritter, The Voice of Reason — Why Recent Judicial Interpretations of the Antiterrorism and Effective Death Penalty Act’s Restrictions on Habeas Corpus are Wrong, 37 Seattle U. L. Rev. 55 (2013).

. The factual and procedural summary is taken from the district court's order. The district court relied on the Supreme Court of California. In re James Edward Hardy, 41 Cal.4th 977, 983-87, 63 Cal.Rptr.3d 845, 163 P.3d 853 (2007) (Hardy II).

. Specifically, the superior court judge found Boyd had admitted his guilt telling a friend "yes, man, I went in to do the lady in and Marcus and I were stumbling through the house, and I went through one room, I tripped upon the kid and grabbed a pillow and put it over his face and stabbed him.” The California Supreme Court explicitly, adopted this finding.

. The State, with its more abundant resources, should also have discovered Boyd’s role in the crime. Instead, the State concealed the existence of an immunity agreement with Boyd granted Boyd immunity and used him as its key witness against Hardy. The prosecutor's conduct in this case raises substantial concerns regarding the reliability of Hardy’s conviction even apart from the Demby's inadequate representation.

. Substantial evidence is also the standard California courts use in reviewing factual and credibility determinations made by a referee during -a reference hearing. In re Cox, 30 Cal.4th 974, 998, 135 Cal.Rptr.2d 315, 70 P.3d 313 (2003). Here, the California Supreme Court properly applied the'standard in that portion of its opinion concerning the reference hearing. Whether counsel’s deficient performance prejudiced Hardy, however, is not subject to the substantial evidence standard and is independently reviewed.

. We do not suggest that a prosecutor can never present factually inconsistent theories. Rather, we emphasize that here the prosecutor presented just one theory to the jury: Hardy was the actual killer.

. In Taylor v. Beard, this court rejected a petitioner’s argument that because the jury found him guilty of being the actual shooter, it could not find him guilty of aiding and abetting. 811 F.3d 326, 327 (9th Cir. 2016) (en banc) (petition for cert. filed). Hardy’s case is distinguishable from Taylor because Taylor was making a "freestanding innocence” claim and the additional evidence he presented tended to inculpate him further. Id. at 333-34. Hardy’s Strickland claim, however, has a much more yielding standard. Additionally, Taylor was tried alone, a jury agreed on every element of the crime that Taylor essentially admitted to committing, and his jury did not need to agree unanimously on the theory presented. Id. at 332 (citing Schad v. Arizona, 501 U.S. 624, 631-32, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)). In contrast, Hardy was tried with two other co-defendants who were alleged to be the aiders-and-abettors and Hardy was tried as the actual killer. Because of the critical differences in the standards that apply to an actual innocence claim versus the Strickland claim in this case and the dissimilar trial procedures used in these two cases, Taylor does not control this case.

. In his opening statement, the prosecutor stated that "there is no doubt in anyone’s mind or ought to be that Mr. Hardy had the knife in his hand and plunged[1] that knife into the bodies of those two people in excess of 65 times.”

. The Strickland test is clear, and it is not a sufficiency of the evidence standard nor is it a substantial evidence standard. The dissent incorrectly suggests otherwise and fails to address or analyze how the decifient performance by attorney Demby fundamentally prejudiced Hardy on all theories of criminal liability.

. Double deference applies when a federal court is reviewing a state court’s application of a general rule. Knowles v. Mirzayance, 556 , U.S. 111, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). The more specific a legal rule is, the more narrow a range of reasonable application exists for that rule. Yarborough, 541 U.S. at 664, 124 S.Ct. 2140. Strickland’s deficiency prong presents a general rule because “[judicial scrutiny of counsel's performance must be highly deferential” and there is “a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” 466 U.S. at 687-88, 104 S.Ct. 2052. Because ”[t]here are countless ways to provide effective assistance in any given case,” courts must be hesitant in performing a post-hoc review of trial counsel’s strategic choices. Id. at 689, 104 S.Ct. 2052. Thus, the federal court asks whether it was reasonable for the state court to find whether trial counsel's performance fell within the range of reasonable professional assistance. Because the prejudice prong of Strickland presents only a more specific legal rule, a case considering only that prong is not subject to double deference as described in Mir-zayance.

. The dissent clings to a subjective interpretation of the Supreme Court's "fairminded jurist” language, insisting § 2254(d) cannot be met because the California Supreme Court and the federal district[1] court came to a different conclusion. Under this interpretation, there would be no reason for a federal appellate court to ever hear § 2254(d) appeals.

. The jury did not get the opportunity to consider Morgan’s sentence. The trial court severed his penalty phase trial from the other defendants when it was discovered that his health was failing due to cancer. Hardy, 41 Cal.4th at 987, 63 Cal.Rptr.3d 845, 163 P.3d *1147 853; People v. Hardy, 2 Cal.4th 86, 128, 197, 5 Cal.Rptr.2d 796, 825 P.2d 781 (1992), modified on denial of reh'g (May 14, 1992). Morgan died before the penalty phase of his separate trial could be held. Id.